IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

FEB 2 2 2002

Michael N. Milby, Clerk

| | | |
|---|---|---|
| HILDA S. JOURDAN, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. H-1999-4081 |
| | § | |
| vs. | § | |
| | § | |
| SCHENKER INTERNATIONAL, INC., | § | |
| | § | |
| Defendant. | § | JURY TRIAL DEMANDED |

## DEFENDANT'S MEMORANDUM OF LAW

(Motion for Summary Judgment)

CAREY & ASSOCIATES
Attorneys for Plaintiff
825 Third Avenue, 30th Floor
New York, NY 10022-7519
Tel.: 212-758-0076
Fax.: 212-758-0069

469

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................. I

TABLE OF AUTHORITIES ............................................ III

  Cases ........................................................ iii

  Statutes ..................................................... iii

PRELIMINARY STATEMENT ............................................. 1

THE COURT HAS ORDERED THE SEALING OF CUSTOMER RECORDS ............ 1

PLAINTIFF'S ALLEGATIONS OF LOSS .................................. 4

STATEMENT OF FACTS ............................................... 5

  A.   Jourdan's Employment ...................................... 5

  B.   The Sales Program ......................................... 8

ARGUMENT ........................................................ 10

POINT I ......................................................... 10

SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING JOURDAN'S CLAIM
FOR INCENTIVES ON THE BARIVEN CONTRACT .......................... 10

  A.   Summary Judgment Standard Of Review ...................... 10

  B.   Jourdan Was Not Entitled To Incentives On The Bariven
       Contract ................................................. 10

  C.   Jourdan's Claims Of Breach Of Contract, Promissory
       Estoppel, And Specific Performance Should Be Dismissed ... 17

POINT II ........................................................ 20

SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING JOURDAN'S CLAIM
FOR 1998 INCENTIVES OF AN ADDITIONAL $30,000 .................... 20

  A.   The Facts ................................................ 20

  B    Jourdan's Claim Is Barred ................................ 25

  C.   Jourdan Cannot Rely On Parol Evidence .................... 31

- i -

468

POINT III ........................................................... 34

PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST JOURDAN ON
THE PROMISSORY NOTE ................................................. 34

CONCLUSION ......................................................... 37

467

## TABLE OF AUTHORITIES

**CASES**

Eckert-Fair Constr. Co. v. Capitol Steel & Iron Co., 178
F.2d 338 (5th Cir. 1949), cert. denied, 339 U.S. 928
(1950) .................................................... 25

Evans v. City of Bishop, 238 F.3d 586 (5th Cir. 2000) ............ 10

F.D.I.C. v. Wallace, 975 F.2d 227 (5th Cir. 1992), cert.
denied, 508 U.S. 939 (1993) ........................... 32,33,36

Fierros v. Texas Department Of Health, 274 F.3d 187 (5th
Cir 2001) ................................................ 10

Hycarbex, Inc. v. Anglo-Suisse, Inc. et al., 927 S.W.2d
103 (Ct. App. Tx, Houston (14th Dist.) 1996) ................ 27

Metromarketing Services, Inc., v HTT Headwear, Ltd., 15
S.W.3d 190 (Ct. App. Tx, Houston (14th Dist.) 2000) ..... 15,27,29

S.E.C. v, VanWaeyenberghe, 990 F.2d 845 (5th Cir. 1993) ......... 2,3

United States v. Lawrence, 276 F.3d 193 (5th Cir. 2001) ...... 5 n3,36

Vogel v. Veneman, 276 F.3d 729 (5th Cir. 2002) .................... 10

**STATUTES**

Rule 56(c), Fed.R.Civ.P. ...................................... 10

Rule 803(6), Fed.R.Evid. ...................................... 5 n3

Rule 1006, Fed.R.Evid. ...................................... 28 ,15

V.T.C.A., Bus. & C. § 26.01 ...................................... 15

466

## PRELIMINARY STATEMENT

Defendant Schenker International, Inc. ("**Schenker USA**")

moves for summary judgment dismissing Plaintiff Hilda S.

Jourdan's complaint.  In addition, Schenker moves for summary

judgment on its counterclaim.[1]  Because of the confidential and

proprietary nature of the customer information raised by

Jourdan's complaint, this motion is filed with portions sealed

as provided in this Court's Confidentiality Stipulation and

Order, dated April 5, 2001.

### THE COURT HAS ORDERED THE SEALING OF CUSTOMER RECORDS

The confidentiality of certain records is undisputed by the

parties.  A Confidentiality Stipulation and Order

("**Stipulation**") was executed by the Court, dated April 5, 2001.

(SUSA Ex 6).  Among other things, the Stipulation stated that

confidential documents shall be used solely for the purposes of

this litigation and "for no other purpose whatsoever." (SUSA Ex

6 at 2).  The Stipulation also provided that "Judicial

Personnel," including this Court and its staff, will be provided

with a copy of the Stipulation and should "take reasonable

---

[1]    This matter was removed to this Court from the District Court of Harris
County, Texas, 334 Judicial District, by Order dated _____, 1999.

precautions to prevent any disclosure of such information in any

manner inconsistent with this stipulation." (SUSA Ex 6 at 3).

Finally, the Stipulation provided:

> Each Confidential Document and
> Confidential Information that is filed
> with the Court shall be submitted in a
> sealed envelope bearing the title of
> this action and shall be marked
> 'CONFIDENTIAL INFORMATION SUBJECT TO
> PROTECTIVE ORDER TO BE OPENED ONLY AS
> THE COURT DIRECTS.'
> (SUSA Ex 6 at 4).

This Court has supervisory power over its own records and

files and access to court records has been denied where access

might be used for improper purposes. S.E.C. v, VanWaeyenberghe,

990 F.2d 845, 848 (5th Cir. 1993).

In deciding whether or not to seal the limited number of

records sought to be sealed by Schenker USA, the Court "must

balance the public's common law right of access against the

interests favoring nondisclosure." S.E.C. v, VanWaeyenberghe,

990 F.2d at 848.  In reaching a decision on a request to seal a

portion of the record, the Court must consider the relevant

facts and circumstances of this matter. Id.  The Court must

consider the presumption in favor of the public's access to

judicial records and articulate why, in the balance, certain

- 2 -

464

records should be sealed. S.E.C. v, VanWaeyenberghe, 990 F.2d at 849.·

Here, the records which disclose customer identities, sales figures, and gross profit calculations should be sealed to protect the proprietary nature of such information from disclosure to the competitors of Schenker USA.

This is a commercial lawsuit and there is no strong public interest in the information sought to be sealed.  On the other hand, disclosure could impair the competitive position of Schenker USA.  A competitor of Schenker USA that learned of a customer's identity as well as of the sales volume and gross profit on such sales, could use the information to compete unfairly with Schenker USA. (Gifford Aff ¶ 8).[2]

---

[2]      Citations preceded by "Compl" refer to the paragraphs and exhibit to the Plaintiff's Original Petition, filed in this matter in the District Court of Harris County, Texas, 334 Judicial District, #1999-51824, on October 15, 1999. ("**Complaint**").
     Citations preceded by "MQC Decl" refer to the paragraphs of the declaration of Michael Q. Carey, executed February 21, 2002 ("**Carey Declaration**").
     Citations preceded by "Gifford Aff" refer to the paragraphs of the affidavit of Stephen R. Gifford, sworn to February 21, 2002 ("**Gifford Affidavit**").
     Exhibits preceded by "SUSA" refer to exhibits submitted in support of the motion of Schenker USA.  SUSA exhibits 1 through 14 are attached to the Carey Declaration.  SUSA exhibits 20 through 33 are attached to the Gifford Affidavit.  Exhibits numbered 13, and 15 through 19 were not used.

463

- 3 -

## PLAINTIFF'S ALLEGATIONS OF LOSS

Hilda S. Jourdan has sued Schenker USA for Breach of

Contract, Promissory Estoppel, and Specific Performance ("**Causes

of Action**"). (SUSA Ex 1: Compl ¶¶ 5-12).  Jourdan seeks damages

of "at least $200,000" and Attorneys' Fees. (SUSA Ex 1: Compl ¶¶

13 and 14).

Effective January 1, 1998, Schenker USA adopted a new Sales

Incentive Program ("**Sales Program**").  The Sales Program is

attached as exhibit A to the Complaint. (SUSA Ex 1).  For easy

reference, a stand alone copy is attached to the declaration of

Michael Q. Carey executed February 21, 2002. (SUSA Ex 4).

Each of Jourdan's Causes of Action is based on an alleged

violation by Schenker USA of the Sales Program. (SUSA Ex 1:

Compl ¶¶ 5, 8, 11 ("promises and representations to her as

described above"), and 12).

---

Citations preceded by "JJ Tr" refer to the pages of the deposition
transcript of plaintiff taken in November 2001.  Single page and line ranges
in such transcript are indicated in the following form: "JJ Tr 54:7-10."
Multi-page ranges in such transcript are indicated in the following form: "JJ
Tr 54-58."  Multi-page and line ranges in such transcript are indicated in
the following form: "JJ Tr 54:7-10 -- 58:1-3."
     Numbers preceded by "JJ", e.g. "JJ001234" refer to documents produced
by Jourdan.  Documents numbered JJ000001 through JJ000478 were produced prior
to her deposition.  Documents numbered JJ000479 through JJ002794 were
produced after her deposition, pursuant to a document request from Schenker
USA, dated September 15, 2000.  Numbers which are not preceded by JJ were
produced to Jourdan by Schenker USA.

462

Jourdan claims that, "[p]ursuant to the Sales Incentive Program", Schenker USA owes her a 10% incentive related to sales to a customer of Schenker USA named Bariven S.A., a Venezuelan oil company ("**Bariven**") in the amount of at least $200,000. (SUSA Ex 1: Compl ¶¶ 8, 13).  She claims such incentives are owed "over the life of the" "five year contract." (SUSA Ex 1: Compl ¶¶ 6, 8).

In addition, Jourdan claims that incentives of "at least $30,000" are owed to her by Schenker USA, pursuant to the Sales Program, for customer sales other than to Bariven in 1998.  (SUSA Ex 1: Compl ¶ 9; see e.g. Compl ¶ 5).

## STATEMENT OF FACTS

**A    JOURDAN'S EMPLOYMENT**

Jourdan was hired by Schenker USA in 1989 to work in the Houston Branch. (JJ Tr 49:9-10).  Over 8 years, through 1997, she was one of Schenker's most productive salespersons. (e.g. JJ Tr 272:15-273:4; SUSA Ex 7).  In 1998, Jourdan was given the title of Oil and Energy Project Manager (JJ Tr 180:1-2; see SUSA Ex 21).[3]  Jourdan was terminated in November 1999 for lack of

---

[3]    Documents identified as business records in the Gifford Affidavit are admissible as evidence pursuant to Rule 803(6), Fed.R.Evid. <u>United States v. Lawrence</u>, 276 F.3d 193, 196 (5th Cir. 2001).

461

productivity. (JJ Tr 467:21—468:1).

Schenker USA is a freight forwarding company. (SUSA Ex 1: Compl ¶ 5). It is a wholly owned subsidiary of Stinnes Corporation. (Gifford Aff ¶ 2). In 1997 (SUSA Ex 1: Compl ¶ 6), Jourdan was assigned as one of an international team of at least 20 persons, including herself, that was to make a bid for the global shipping business of Bariven. (JJ Tr 355-366). Jourdan was the only person on the worldwide team who was employed as a salesperson. (SUSA Ex 1: Compl ¶ 6; JJ Tr 368:14-15; JJ Tr 384:13-17). The team included managers and employees of Schenker International, A.G., a German corporation ("**Schenker Germany**"), an affiliate of Schenker USA, of the subsidiaries of Schenker Germany in Holland and in Caracas, of the New York headquarters of Schenker USA, and of the Houston Branch office of Schenker USA. (JJ Tr 355-366).

Schenker USA won the bid. A lengthy document described by Jourdan as a five year contract was signed by Schenker USA and by PDVSA Services, Inc. on behalf of Bariven, dated April 2, 1998 ("**Rate Agreement**"). (SUSA Ex 1: Compl ¶ 6; SUSA Ex 20: Pl

460

EBT Ex 2 at #2332 and pp 1 and 27 ).[4]

After the Rate Agreement was executed, Jourdan continued to work with a team that was assembled under the leadership of Patrick Jacob to work exclusively on the Bariven orders. (JJ Tr 384:18–385:5). However, by August, 1998, only 5 months after the Rate Agreement was signed, Schenker USA determined that the account was losing money and that it would lose substantial amounts annually if the rates were not renegotiated. (SUSA Ex 22). Jourdan expected there would be losses before the Rate Agreement was executed. (JJ Tr 397:23-398:21). In August 1998, Jourdan was taken off the account.[5] (SUSA Ex 21 at 5 [#5572]).

The rates were renegotiated beginning in August 1998,

---

[4]     The document was not a contract that bound Bariven to ship any goods through Schenker Worldwide and its subsidiaries.  The Rate Agreement stated at page 1:

> WHEREAS, to avoid repetitive negotiations,
> BARIVEN desires to establish an agreement
> defining terms and conditions applicable when
> BARIVEN does business with [Schenker USA] after
> the Effective Date….. (SUSA Ex 20, p 1).

[5]     Jourdan confirmed these events in a memo she wrote to Manfred Engst, an officer of Schenker USA. (SUSA Ex 21 p 5 [5572 at last par]).  In July 1999, Jourdan had a conversation with her manager who informed her that while Bariven was profitable in 1999, Bariven "was turned into a house account and she would not be getting credit for Bariven." (SUSA Ex 1: Compl ¶ 8). Assuming Jourdan had such a conversation in July 1999, the conversation merely confirmed what she was informed on August 21, 1998, approximately one year earlier, that she was taken off the account. (SUSA Ex 21 p 5 [#5572 at last par]).

459

within 5 months of the signing of the Rate Agreement. (SUSA Ex 22). Jourdan was not part of the team that renegotiated the new rates. (JJ Tr 394:14-395:8).

## B. THE SALES PROGRAM

Attached to the Complaint (SUSA Ex 1) as Exhibit A is a copy of the Sales Program. It is reproduced as SUSA Exhibit 4.[6] Jourdan received a copy. (JJ Tr 120:10-21). The Sales Program memo is dated May 29, 1998 but it states that it is effective "immediately and retroactive to 1 January 1998." (SUSA Ex 4, p 1).

The Sales Program states that the attached sales guidelines govern incentives. (SUSA Ex 4, p 4). The Sales Guidelines portion of the Sales Program states that, after 30 months of employment, a person must have gross profit of "4 times salary & fringe". (SUSA Ex 4, p 4). Jourdan's combined salary and fringe benefits in 1998 was $87,500. (SUSA Ex 8 at #0053; SUSA Ex 9 at #0072).

The Sales Program includes an example how to determine if an incentive is owed to a salesperson. For 1998 and 1999, since

458

Jourdan had salary and fringe benefits of $87,500, she would receive no incentive payment for the first 3 times $87,500 or $262,500 of growth in gross profit. However, she would receive a 7% incentive on the amount of growth in gross profit that exceeded $262,500 (3 x) but was less than $350,000 (4 x), and a 10% incentive on the amount of growth in gross profit that exceeded $350,000 (4 x).[7]

---

[6]   The Sales Program attached to the Complaint did not have numbered pages. Each page of SUSA Ex 4 has a circled number added to facilitate reference.

[7]   The Sales Program sets forth the calculations in detail. However, while the Sales Program presents a figure of $280,000 as the measure of growth in gross profit, the calculations actually use $330,000 ($150M + 50M + 130M) of growth in gross profit to calculate an incentive of $16,500. (SUSA Ex 4, p 3).

457

## ARGUMENT

### POINT I

**SUMMARY JUDGMENT SHOULD BE GRANTED
DISMISSING JOURDAN'S CLAIM FOR INCENTIVES ON
THE BARIVEN CONTRACT**

**A.    SUMMARY JUDGMENT STANDARD OF REVIEW**

Summary judgment is proper "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue

as to any material fact and that the moving party is entitled to

judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.; <u>Vogel v.

Veneman</u>, 276 F.3d 729, 732 (5th Cir. 2002).

In making a summary judgment determination, "[d]oubts are

to be resolved in favor of the nonmoving party, and any

reasonable inferences are to be drawn in favor of that party."

<u>Evans v. City of Bishop, 238 F.3d 586, 589 (5th Cir.2000)</u>;

accord, <u>Vogel v. Veneman</u>, 276 F.3d at 732; <u>Fierros v. Texas

Department Of Health</u>, 274 F.3d 187, 190 (5th Cir 2001).

**B.    JOURDAN WAS NOT ENTITLED TO INCENTIVES ON THE BARIVEN
CONTRACT**

The Sales Program adopted in 1998 was a change in the

Schenker USA incentive program. (SUSA Ex 4, p 2 [first par]).

Moreover, the Sales Program makes it clear that management in

456

its discretion could assign accounts to, and take accounts away

from, a salesperson ("a sales person maintains an account for as

long as management deems necessary."). (SUSA Ex 4, p 2).

Indeed, the adoption of the Sales Program in May 1998,

retroactive to January 1, 1998, was clearly an exercise of such

management discretion.

Jourdan was informed and understood that management had the

discretion to assign accounts to a salesperson and to take

accounts away from a salesperson. (JJ Tr 248:25—253:17).  A

"House Account" is one on which no salesperson is paid a sales

incentive. (JJ Tr 266:5-9).  Jourdan was informed on August 21,

1998 that she was no longer to be involved with the Bariven

account and was to return to and pursue her sales efforts. (SUSA

Ex 21 p 5/#5572).  Bariven was also treated as a "house

account." (SUSA Ex 1: Compl ¶ 8; Gifford Aff ¶ 13).

1998 sales to Bariven created a substantial loss to

Schenker USA. (SUSA Ex 27 #6794).  As noted above, Jourdan was

taken off the account in August 1998. (SUSA Ex 21 p 5 [#5572]).

In 1999, Jourdan was never assigned to the Bariven account in

455

any capacity.[8]

Assuming without conceding that the Bariven account was once assigned to Jourdan, after she was told she was no longer working on it, Jourdan was no longer entitled to receive a sales incentive with respect to Bariven.  As a sales manager, Jourdan assigned customers to and took customers away from the salespersons she managed, with the same consequences. (JJ Tr 252:12—253:17).[9]  Indeed, Jourdan's e-mails regarding her 1998 commissions reflected that after an account was taken from one person and reassigned to another salesperson, the new salesperson was entitled to credit for the gross profit on the sales made after the switch, and the prior salesperson, if still employed, to such credit on sales before the switch. (e.g. SUSA Ex 23 at JJ000340-341; Ex 24).

Moreover, there is nothing in the language of the Sales Program on which to base Jourdan's allegation that, even after

---

[8]      Gross profit on sales to Bariven by Schenker USA was in 1999: $xxxx (SUSA Ex 27 #6797), in 2000: $xxxx (SUSA Ex 27 #6800), and in 2001: $xxxx. (SUSA Ex 27 #6803).
[9]      Where a large account was won through the effort of more than one person, Schenker USA sometimes divided the sales credit. (SUSA Ex 26, see re Enron).  Jourdan wants the Court to believe that where over 20 persons were nvolved in winning the Bariven bid for Schenker USA, that she, nevertheless, was the only person entitled to receive an incentive payment. (SUSA Ex 1: Compl ¶¶ 6 and 8).

- 12 -

being terminated, "[p]ursuant to the Sales Incentive Program,

Jourdan is due 10% incentive on the gross profits of the Bariven

account <u>over the life of the contract</u>." (SUSA Ex 1: Compl ¶ 8;

emphasis added). To the contrary, the Sales Program is founded

on growth in sales from one year to the next. (SUSA Ex 4, p 3).

The Sales Program makes it clear that incentives are payable

only on growth and that there is no growth if sales in the

second year do not exceed those of the prior year. (SUSA Ex 4,

e.g. p 3). There is no purpose in providing an incentive to

grow sales to one who is no longer employed and has no authority

to represent the company. Indeed, if the customer were assigned

to another salesperson, as Jourdan said, the successor would

earn credit for sales growth. (SUSA Ex 24 at JJ000340-341). No

salesperson was ever assigned to receive credit for sales on the

Bariven account. (Gifford Aff ¶ 13). Finally, Jourdan admitted

that a salesperson only received commissions over the life of a

contract if the salesman was still employed by Schenker. (JJ Tr

258:4 - 11).

Although Jourdan was terminated in November 1999, she

apparently also claims incentives for 2000 through 2002. (JJ Tr

258:12-18). However, she understood that incentives would not

453

be paid to a salesperson in relation to sales made when that person was not employed by Schenker USA. (JJ Tr 248:25—250:23). Moreover, Jourdan's claim is based on the Sales Program.  Since the Sales Program provides no way to calculate an incentive for someone no longer employed, Jourdan's claims to incentives following her employment should be dismissed.

Jourdan implicitly confirmed this company policy when she claimed that Manfred Engst, Chief Operating Officer of Schenker USA, promised her a sales commission on sales to Bariven by testifying, not that the Sales Program was the basis of her entitlement, but that the basis was Engst's alleged promise that "when we make money, you make money " (**Bariven Promise**). (JJ Tr 464:17—465:2).

The alleged Bariven Promise is not included as the basis of any of the Causes of Action.  It appeared for the first time during Jourdan's deposition.  Even if it were included in the Complaint, any such promise is unenforceable based on the Texas statute of frauds:[10]

> (a) A promise or agreement described in
> Subsection (b) of this section is not

---

[10]    Schenker USA pled the statute of frauds as its Seventh Affirmative Defense. (SUSA Ex 2, ¶ 34).

452

enforceable unless the promise or
agreement, or a memorandum of it, is
   (1) in writing; and
   (2) signed by the person to be
charged with the promise or agreement….

(b) Subsection (a) of this section
applies to:
          ***
   (2) a promise by one person to answer
for the debt, [or] default … of another
person;
          ***
   (6) an agreement which is not to be
performed within one year from the date
of making the agreement….

V.T.C.A., Bus. & C. § 26.01.

Under section (b)(2), if the Bariven Promise were construed

as a promise of Engst to answer personally for the alleged

Schenker obligation to Jourdan, it is unenforceable because

there is no signed writing to that effect.

Initially, the application of section (b)(6) to a given

contract is a question of law. Metromarketing Services, Inc., v

HTT Headwear, Ltd., 15 S.W.3d 190, 195 (Ct. App. Tx, Houston

(14th Dist.) 2000). However, if the parties fix the time of

performance and the agreement cannot be performed within one

year, the statute of frauds applies. Id.

Here, Jourdan specified a fixed time of performance when

451

she noted that the Rate Agreement had a five year term and

claimed that she was entitled to commissions for the life of the

agreement. (SUSA Ex 1: Compl ¶¶ 6, 8).

Although Jourdan concedes that the Bariven Rate Agreement

was not profitable in 1998, she claims Schenker USA had a "gross

profit of $1,018,510" in 1999. (SUSA Ex 1: Compl ¶ 8).  Even

assuming that the profit on the account in 1999 was $1,018,510,

Jourdan's claim must be dismissed.  Jourdan claims that the

Bariven Promise was made in 1998, at or about the time when she

was informed she was off the account, during a visit by Engst to

Houston. (JJ Tr 241:6-25; Tr 244:5--246:19; Tr 464:17--465:8).

Jourdan was told on August 21, 1998 that she was off the

account. (SUSA Ex 21, p 5 [#5572]).  Engst was in Houston for a

meeting on 8/26/98. (SUSA Ex 14, JJ000222).  Even if Jourdan

limited the promise to commissions for 1999, as opposed to the

five year term of the Rate Agreement, that profit would not have

been determined and commissions to Jourdan calculated until well

into the first quarter of 2000. (Gifford Aff ¶ 9).  Even if the

date for determining the profitability of sales to Bariven and

payment of any commissions to Jourdan were 1/1/2000, that date

was more than one year after the Bariven Promise was allegedly

450

made.  It is self-evident that the agreement could not be performed for profits, if any, in the years 2000 and after.

Finally, there is no writing which makes reference to the Bariven Promise, signed or unsigned.[11]

## C. JOURDAN'S CLAIMS OF BREACH OF CONTRACT, PROMISSORY ESTOPPEL, AND SPECIFIC PERFORMANCE SHOULD BE DISMISSED

For the reasons set forth above, Jourdan's claims of breach of contract, promissory estoppel, and specific performance should be dismissed.

Jourdan's claim of promissory estoppel should also be denied because she has failed to allege facts to support her claim of reliance.  Her claim is limited to work done on the Bariven contract. (SUSA Ex 1: ¶ 11).  Moreover, the only promise she describes is described by incorporating the Sales Program. Id.  Jourdan claims that in reliance on the Sales Program, she devoted "over a year of her time to securing and implementing the Bariven account for Schenker." Id.  Jourdan was taken off

- 17 -

449

the account on August 21, 1998. (SUSA Ex 21, p 5).  Thus, she

claims that the promises she allegedly relied upon were made

more than one year earlier, prior to August 21, 1997.  However,

the Sales Program was not even in existence until May 29, 1998.

(SUSA Ex 4, p 1).  Jourdan could not reasonably have relied on

the Sales Program.  The Sales Program expressly stated that "a

sales person maintains an account for as long as management

deems necessary.").  (SUSA Ex 4, p 2).  Thus, Jourdan could not

have placed any reliance on the only promise she identifies in

her complaint and the complaint should be dismissed.

In any event, to the extent she relied upon the Sales

Program in working on Bariven, the alleged bargain she made was

fulfilled for 1998.  Without a profit, there was no additional

sales incentive payment owed to her by reason of any work on

Bariven.  Assuming the Sales Program is a contract, it contains

no requirements that Schenker make incentive payments for

accounts that generate no gross profit, or where the salesperson

---

[11]    As shown in Point II, when it came to Jourdan's commission for 1998,
she wrote many e-mail documents to correct the company's calculations of her
1998 sales and the incentive payment to which she was entitled.  Jourdan was
also a prolific memo writer when Bariven was involved. (e.g. SUSA Ex 21).
Moreover, Jourdan was a careful record-keeper.  To date, she has produced
2794 Schenker USA documents from files she kept following her termination.
However, as noted in this memorandum, Jourdan admits she has nothing in

44S

is no longer assigned to the account, or for any time after the

employee has been terminated.   Jourdan has simply failed to

allege any basis in the Sales Program for any of the relief she

seeks.

Jourdan's claim of Specific Performance (SUSA Ex 1: Compl ¶

12) should be dismissed for an additional reason.   Jourdan

alleges that she had a "contract with Defendant." <u>Id</u>.   Jourdan

was an at-will employee. (JJ Tr 51).   To the extent the contract

she refers to was the Salés Program, judgment should be entered

for Schenker USA.   The Sales Program was not "her contract."   In

any event, as described above, the contract was honored in all

respects.   From Jourdan's perspective, any claim that the Sales

Program was not honored is barred by the statute of frauds

(Bariven 1999 and later) or accord and satisfaction ($30,000

claim for 1998 incentive payment. See Point II).

---

writing to support her claims to commissions which are the subject of this
suit.

4 4 7

## POINT II

**SUMMARY JUDGMENT SHOULD BE GRANTED
DISMISSING JOURDAN'S CLAIM FOR 1998
INCENTIVES OF AN ADDITIONAL $30,000**

Jourdan also claims that she is owed at least $30,000 in incentives for 1998. (SUSA Ex 1: Compl ¶ 9).  As with the claim for incentives on Bariven sales, the only basis alleged for such claim is the Sales Program.  Her complaint provides no further detail to support her claim.  Nevertheless, Jourdan has made it clear that her claim is a claim consistent with the Sales Program. (JJ Tr 78, 90, 101).

### A.    THE FACTS

With respect to 1998 and 1999, Schenker USA paid incentives in the year following that in which they were earned. (Gifford Aff ¶ 9; e.g. SUSA Ex 25; Ex 10).  Thus, incentives for 98 were calculated and paid to Jourdan shortly after the first quarter of 99. Id.[12]

Jourdan received a report of the amount of the gross profit growth on which her incentives for 1998 would be calculated and concluded "there is a great disparity in the final tally." (SUSA

---

[12]    The Sales Program states that payments of incentives were to be made quarterly. (SUSA Ex 4 at 2).  This schedule was not followed. (JJ Tr 271:1-9).

446

Ex 8 at #0054).  However, Jourdan had not submitted all the information that she had been asked to submit prior to the publication of the report. (JJ Tr 204-205; SUSA Ex 11).  On March 1, 1999, Jourdan promised to provide "all figures" by the end of the day. (SUSA Ex 11).  Although Andreas Rothe, employed at headquarters for Schenker USA, advised Jourdan that it was too late for Jourdan to submit her information, Id., Jourdan claimed that Engst gave her additional time to submit the data on which her 98 incentive would be calculated. (JJ Tr 204:7-23; SUSA Ex 11).

Rothe and Andrew Dancescu were the persons in the accounting department for Schenker USA in 1999 assigned to audit Jourdan's sales figures. (e.g. JJ Tr 210-212)(see SUSA Ex 11, and Ex 8 at #0053).

By March 17, 1999, Dancescu determined that Jourdan had to have growth in gross profit exceeding $262,500, three times Jourdan's combined salary and benefits of $87,500, before she would be entitled to an incentive under the Sales Program. Dancescu noted that Jourdan's total growth in sales for 1998 was only $236,381, short of what she needed to earn an incentive. (SUSA Ex 8 at #0053; SUSA Ex 9 at #0072).  Jourdan was informed

- 21 -

445

of the results of the audit the next day. Id.[13]

Approximately 1 week later, on March 23, 1999, Jourdan informed Robert Doernte, the President and Chief Executive Officer of Schenker USA, and six other officers in management or accounting, including Engst, plus Susan Ferraro, the head of Human Resources, that she had been working with Dancescu to resolve the differences in his and her numbers for 1998 sales growth.  Jourdan attached a list of specific items that were in question ("**Jourdan Spreadsheet**"). (SUSA Ex 28; Ex 8 at #0058-59).

On the next day, March 24, 1999, Jourdan reported that she and Dancescu were "now on the same page" regarding the numbers audit. (SUSA Ex 9 at #0279).  Jourdan added that "[s]pecial recognition should go to [Dancescu] who was very helpful and patient in explaining and working thru this process with me…." Id.

Approximately one week later, on March 30, 1999, Mike Bujold, by then Jourdan's immediate boss (see SUSA Ex 25), informed her that her sales credits for 1998 were finally

---

[13]    The Sales Program states that incentives are payable only where growth in gross profit exceeds 3 times combined salary and fringe benefits. (SUSA Ex

441

determined.  He explained that the initial calculation of

$236,381 in gross profit sales growth was increased by

$111,532.85 to total growth of $347,913.85.  He also said that

Jourdan was entitled to a $5,979 incentive payment, subject to

the approval of management ("**Bujold Memo**").  (SUSA Ex 25).

Approximately three weeks later, by memo dated April 19,

1999, Susan Ferraro, head of Human Resources, informed Jourdan

that the proceeds of her $5,979 1998 bonus [after taxes and

other deductions, the amount was $3,847.48] would be applied to

her outstanding loan of $40,000 from Schenker USA. (SUSA Ex 10).

Jourdan admitted that the incentive was applied to the loan. (JJ

Tr 119:6-12; JJ Tr 466:9-24).  (This is the loan that is the

subject of the counterclaim against Jourdan, discussed in Point

III).

Jourdan accepted the calculation and payment of her bonus

without further protest.  Over two months later, on June 25,

1999, Bujold wrote her that her 1999 sales were below target,

then at approximately $24,000 of an annual goal of $262,500, the

same goal used in 1998 to calculate the minimum growth in gross

profit needed to trigger an incentive payment.  He added that

4 p 3-4).

443

her downward trend in sales growth, to $347,000 in 1998 needed

to stop and he offered her his total support. (SUSA Ex 9 at

#0072).   Jourdan responded immediately, thanking Bujold for his

support and acknowledging that she understood that the Sales

Program had changed the method by which incentives were

calculated:

> Regarding the downward trend, I would
> like to ask that you take into
> consideration that the actual methods
> of calculating total profit have
> changed… My actual gross income on my
> accounts last year was at a recorded
> 765,000. – approx.  The reason for the
> low 347,000 is due to the new measuring
> system for bonus payments.

(SUSA Ex 9 at #0351).

Jourdan was fully familiar with the Sales Program and

negotiated her 1998 commission based on such understanding.   The

Jourdan Spreadsheet presented her requested corrections exactly

as the Sales Program specified. (SUSA Ex 28).   She calculated

the Sales Credit column as the increase in 1998 gross profit

over 1997 gross profit.   Where the 1998 gross profit was lower

that that for 1997, no amount is entered in the Sales Credit

column.   See, for example, the entries for Acumen, ITF; Petrofac

and Smith Systems.

## B.   JOURDAN'S CLAIM IS BARRED

Jourdan's claims to an additional $30,000 or more in 1998

commissions is barred by the doctrine of accord and

satisfaction.   To establish an accord and satisfaction, Schenker

USA must show 1) that it tendered the amount paid to Jourdan in

full satisfaction of her claim to sales incentives for 1998; 2)

that there was an acceptance of the sum tendered; and 3) that

Jourdan accepted it. Eckert-Fair Constr. Co. v. Capitol Steel &

Iron Co., 178 F.2d 338, 340 (5th Cir. 1949), cert. denied, 339

U.S. 928 (1950).[14]

When Bujold informed Jourdan in his March 30, 1999 e-mail

that Jourdan would get credit for an additional $111,532.85 in

gross profit growth for 1998, he provided the components of the

increase to Jourdan. (SUSA Ex 25).   Following a month of

communications over the correct base for calculating Jourdan's

1998 incentive payment (see SUSA Ex 11 dated 3/2/1999), in

response to the Jourdan Spreadsheet, the Bujold Memo was an

"unmistakable communication" to Jourdan that the $347,913.85

total gross profit growth and payment of the $5,979 incentive
were his final calculations in full satisfaction of Jourdan's
claims:

> we finalized your sales results 1998
> final number $347913.85
>
> you initially had credit $236,381.00
>
> from your listing you were credited an
> additional $111532.85 ….

(SUSA Ex 25).

In the third week of April, 1999, Jourdan was informed that
she had been credited with an incentive of $5,979. (SUSA Ex 10).
She did not object.  Indeed, approximately three months later,
by e-mail dated June 25, 1999, Bujold questioned whether Jourdan
would reach her 1999 sales target.  As noted above, in her
response, Jourdan again confirmed her acceptance of the 1998
gross profit growth total of $347,000 calculated by Schenker USA
headquarters personnel. (SUSA Ex 9 at #0351).

Under such conditions, Jourdan's acceptance of the $5,979
is an accord and satisfaction that bars her claim for an

---

[14]     Accord and Satisfaction was pled as the First Affirmative Defense in
the answer of Schenker USA. (SUSA Ex 2 ¶ 15).  In the Eighth Affirmative
Defense, Schenker USA pled that all amounts owed to plaintiff have been paid
in full. (SUSA Ex 2 ¶ 35).

440

additional $30,000. <u>Metromarketing Services, Inc., v HTT</u>

<u>Headwear, Ltd.</u>, 15 S.W.3d at 198; <u>Hycarbex, Inc. v. Anglo-</u>

<u>Suisse, Inc. et al.</u>, 927 S.W.2d 103, 108 (Ct. App. Tx, Houston

(14th Dist.) 1996).

The Bujold memo makes direct reference to the Jourdan

Spreadsheet: "<u>from your listing</u> you were credited an additional

$111532.85…." (SUSA Ex 25 (emphasis added)).  To facilitate the

Court's understanding of how the Jourdan Spreadsheet and the

Bujold Memo are integrated, we have created a summary

spreadsheet ("**Summary Spreadsheet**"). (SUSA Ex 29).[15]  Columns A

through F of the Summary Spreadsheet duplicate the Column titles

in the Jourdan Spreadsheet.  Under "Customer Name", column C,

the Summary Spreadsheet includes each customer listed in the

Jourdan Spreadsheet.  The total figures entered in the Jourdan

Spreadsheet under "Gross Profit YTD 1998," "Gross Profit Total

1997," and "Sales Credit", columns D-F, respectively, are

duplicated in the Summary Spreadsheet.  In the Summary

Spreadsheet, the column heading "Sales Credit" is renamed "JJ

Sales Credit."  To its right are added 3 columns, "Bujold Sales

Credit," "Bujold Added," and "Bujold Comments."  The source of

439

the information in these last three columns is the Bujold Memo.

The Jourdan Spreadsheet lists 20 customers, sales to 14 of which produced a Sales Credit. Where Jourdan claimed a Sales Credit, Bujold gave her credit in the exact amount in 12 of the 14 instances. With respect to Enron, Jourdan's claim was reduced by 50% because Bujold noted, "only 50% credit given per walther borchers." Borchers was the Houston Branch Manager in 1998 (JJ Tr 49:19-21) and he explained in an e-mail to Dancescu, dated 3/23/99, copied to Jourdan, that he and Jourdan agreed to divide the profits 50-50 after the previous salesperson assigned the account left Schenker USA. (SUSA Ex 26). The only other reduction was for Dresser/DMD, from $7,433 to $3,302. As noted above, Jourdan never registered any complaint concerning such reductions. Moreover, in her lengthy deposition relating to her $30,000 claim, Jourdan never mentioned either reduction as the basis of the claim for the additional incentive payment.

The amounts in column G of the Summary Spreadsheet, in the column "Bujold Sales Credit", are entered as claimed by Jourdan or as agreed by Bujold. The column totals $347,290.30. (SUSA Ex 29: cell G-47). Bujold credited Jourdan with $623.55 more as

---

[15] A summary may be considered by the Court. Rule 1006, Fed.R.Evid.

- 28 -

her final sales credit, $347,913.85. (SUSA Ex 29: cells F-51 and G-51).

In column H of the Summary Spreadsheet, "Bujold Added", we entered the numbers stated in the Bujold Memo.  The total of column H in the Summary Spreadsheet is $111,532.24 (SUSA Ex 29: cell H-47).  Bujold credited Jourdan with 61 cents more, $111,532.85. (SUSA Ex 29: cells F-52 and G-52).

Jourdan's revised sales credit growth did not exceed her combined annual salary and fringes by 4 times.  Thus, she was limited by the Sales Program to an incentive based on a rate of 7%. (SUSA Ex 4 at 3).  Using the growth figure in the Bujold Memo, and deducting the salary and fringe benefit amount of $262,500 (3 x $87,500) set forth in the Dancescu e-mail (SUSA Ex 8 at #0053) and in the June 25, 1999 e-mail from Bujold (SUSA Ex 9 at #0072), Jourdan had gross profit growth of $85,413.85 that was eligible for the 7% rate, giving her a commission of $5,978.97 (SUSA Ex 29: cells F-55 through F-59), rounded in the Bujold Memo to $5,979.

Jourdan had to reject the incentive payment to defeat the defense of accord and satisfaction. Metromarketing Services,

437

Inc., v HTT Headwear, Ltd., 15 S.W.3d at 197.   She did not do so

and her acceptance of the $5,979 was an accord and satisfaction

that bars her from now seeking to recover a greater amount.   Id.

Finally, Jourdan claimed "at least $30,000," in addition to

the $5,979 incentive she received for 1998.   She did so for the

first time when she filed her Complaint, without identifying the

basis for her claim. (SUSA Ex 1: Compl ¶ 9).[16]   It was not until

her deposition in November 2001 that Jourdan claimed for the

first time that Engst agreed to pay her an additional $30,000 in

incentives for 1998 ("**$30,000 Promise**").   (JJ Tr 156:16-21).

However, Jourdan admits that Engst made it clear that any

such payment would be calculated consistent with the Sales

Program and was not a payment in addition to that which Jourdan

was to be paid under the Sales Program for 1998:

> Q: You're not saying that Manfred Engst
> ultimately agreed for -- accepting the

---

[16]   Defendant served interrogatories asking Jourdan, among other things, to
state the basis for her allegation in paragraph 9 of the complaint that
Schenker owes you at least $30,000 in incentives for 1998, specifying the
names of customers or account numbers for which such incentives are allegedly
owed. (SUSA Ex 12, p 3, Interrogatory # 2).   In response, by answers dated
October 30, 2000, Jourdan merely stated: "This answer will be supplemented
when documents are located to fully respond to this question." Id.   By the
time of her deposition on December 2001, over one year later, Jourdan did
nothing to supplement her answer.   To the contrary, Jourdan testified that
there was no document which supported her claim.   Indeed, after her
deposition, she produced the Jourdan Spreadsheet, a document which undermines
her claim.

> arguments you made to him, whatever
> they were – that you were going to get
> an additional $30,000 over what you
> would have gotten consistent with the
> sales incentive program?
> A: It would have been consistent with
> the sales incentive program.
> Q: Okay. Okay. So all of this dispute
> was being handled and ultimately
> resolved consistent with the sales
> incentive program?
> A: Yes.

(JJ Tr 200:24 – 201:9).[17]  Since the Engst Promise did not change

the basis on which the company calculated Jourdan's $5,979

incentive payment, Jourdan's acceptance of the payment bars her

$30,000 claim on the basis of accord and satisfaction.


C.    **JOURDAN CANNOT RELY ON PAROL EVIDENCE**

The alleged conversation with Engst to pay an _even_ $30,000

to Jourdan, as she testified (JJ Tr 200:18–201:9), is not

alleged in the complaint.  Referring to the Sales Program, the

complaint merely alleges that "Schenker failed to pay Jourdan

435

for commissions in 1998 in <u>an amount of at least $30,000…."</u>
(SUSA Ex 1 ¶ 9).  Jourdan has not consistently described the
terms of the alleged promise.  Even if the conversation with
Engst were an agreement independent of the Sales Program to pay
"at least $30,000", testimony about such conversation is
inadmissible parol evidence.  The Supreme Court of Texas has
defined the parol evidence rule as follows:

> 'When parties have concluded a valid
> integrated agreement with respect to a
> particular subject matter, the rule
> precludes the enforcement of
> inconsistent prior or contemporaneous
> agreements.'

<u>F.D.I.C. v. Wallace</u>, 975 F.2d 227, 229 (5th Cir. 1992, cert.
<u>denied</u>, 508 U.S. 939 (1993)(citations omitted).

Here, in April 1999, Jourdan accepted the determination by
Schenker USA that she was entitled to an incentive payment of
$5,979 for 98 gross profit growth.  The Engst Promise occurred

---

[17]    In the Jourdan Spreadsheet, Jourdan claimed Sales Credit of $404,360.50
(SUSA Ex 28 at JJ001424) ($404,159.57 in the Summary Spreadsheet).  If
$52,904, representing the commission reduction on Enron per Borchers, is
deducted from the total sales credit claimed by Jourdan, her claim totals
$351,421 ($404,325 less $52,904), only $3,508 more in sales credit than she
received.  Assuming such amount was fully eligible for the 10% incentive,
Jourdan had a claim to an additional $350, not an additional $30,000.  If
nothing was deducted from her total sales claim of $404,360 in sales credit, she would
have a claim for an additional sales credit of $56,446 ($404,360 less
$347,914).  Again, assuming such amount was fully eligible for the 10%
incentive, Jourdan had a claim to an additional $5,644, not an additional
$30,000.

in March 1999. (JJ Tr 210:12—213:6).  Jourdan testified that it

occurred "simultaneously" (JJ Tr 212:20) with her discussions

with "Andrew" Dancescu (JJ Tr 210:19), Rothe (JJ Tr 210:24),

Borchers (JJ Tr 211:11) and Bujold (JJ Tr 211:23).  She

testified that her claim to additional incentive payments was

rejected by Bujold. (JJ Tr 211:21-23).  Thus, the discussion

occurred prior to the Bujold memo dated March 30, 1998, in which

he approved her incentive payment (SUSA Ex 25) as well as prior

to the April 19, 1999 incentive payment itself.[18]  Since the last

communications on the matter were the Bujold Memo, followed by

the memo of Ferraro confirming that the incentive would be

credited toward repayment of the promissory note, testimony

about the Engst Promise is inadmissible. F.D.I.C. v. Wallace,

975 F.2d at 229.

   For the reasons set forth above, Jourdan's claims of breach

of contract and specific performance should be denied.

---

[18]    Jourdan admits that the $30,000 Promise was never reduced to writing,
by herself or anyone else. (e.g. JJ Tr 87, 113, 123, 141:5-9, 212-213).

- 33 -

463

## POINT III

### PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED
### AGAINST JOURDAN ON THE PROMISSORY NOTE

To facilitate Jourdan's purchase of a home in Houston, in

1998, Schenker USA loaned her $40,000. (JJ Tr 467:7-16; SUSA Ex

5). As consideration, Jourdan executed a promissory note in the

same amount, dated June 1, 1998 ("**Note**"). (SUSA Ex 5, p 1; JJ Tr

465:12—23; Tr 466:7-8). Jourdan admits that the Note is an

instrument for the payment of money only. (SUSA Ex 3, Answer to

Counterclaim, ¶ 8).

In its Answer to the Complaint, Schenker counter-claimed

against Jourdan for the unpaid balance of the note, interest and

attorneys' fees. (SUSA Ex 2 ¶¶ 36-39).

Section 1.1 of the Note stated that:

> Borrower agrees to repay this amount
> out of her yearly bonus commencing with
> the 1998 bonus issues in March 1999.
> If this amount is not sufficient to
> satisfy the loan, the balance will be
> paid in equal semi-monthly amounts (not
> to exceed $250.00) until the balance is
> paid in full ….

(SUSA Ex 5, p 1).

Pursuant to such terms, Jourdan's incentive of $5,979 for

- 34 -

4 3 2

1998, net of taxes and other payroll deductions, was applied in 1999 to reduce the balance of the loan. (JJ Tr 119; Tr 466:9-24; SUSA Ex 10). No payments have been made by Jourdan in further payment of the Note. (JJ Tr 466:15-21). Jourdan admits she owes the balance to Schenker USA. (JJ Tr 467:2-4).

Section 1.3 of the Note also provides that if Jourdan leaves the employ of Schenker USA, "this note, or balance thereof, becomes immediately due and payable. (SUSA Ex 5, p 1). When Jourdan was terminated in November 1999, the Note fell due. At that time, the unpaid balance of the note was $32,307.85. (SUSA Ex 10).

Interest is also payable on the unpaid balance of the note at the "rate of 8.5% per annum" from its inception, June 1, 1998 (SUSA Ex 5, first paragraph). Interest on the note from December 1, 1999 through January 31, 2002 totals $5,950 ($32,307.85 x .085 x 26/12). (Gifford Aff ¶ 12).[19]

To recover on a promissory note, Schenker USA must only

---

[19]     Section 3.2 of the Note provides that "in any action or proceeding to enforce this Note, Holder shall be entitled to recover its costs and expenses, including attorneys' fees."

431

show that 1) Jourdan signed it, 2) Schenker USA is the current owner of the note, and 3) that the note is in default. United States v. Lawrence, 276 F.3d 193, 197 (5th Cir. 2001).   Summary Judgment is warranted against Jourdan on the note since she conceded that she asked for and was granted the loan of $40,000, that she executed the note, and reaffirmed her obligation to pay it.   United States v. Lawrence, 276 F.3d at 196; F.D.I.C. v. Wallace, 975 F.2d at 228.

Summary judgment should be granted against Jourdan in the amount of $38,257.85 ($32,307.85 + $5,950), plus interest from January 31, 2002 until paid, and for costs and expenses.

---

However, Schenker USA does not seek summary judgment at this time with respect to the amount of attorneys' fees owed by Jourdan.  If judgment is entered on the note in favor of Schenker USA, the company will later move for summary judgment with respect to the attorneys' fees.  Accord, F.D.I.C. v. Wallace, 975 F.2d at 228 n.

## CONCLUSION

Plaintiff's motion for summary judgment should be granted.

Dated: New York, New York
       February 21, 2002

Respectfully submitted,

CAREY & ASSOCIATES

By: _____
       Michael Q. Carey
Admitted Pro Hac Vice
825 Third Avenue, 30th Floor
New York, NY   10022-7519
(212) 758-0076
(212) 758-0069

ATTORNEY-IN-CHARGE FOR DEFENDANT
SCHENKER INTERNATIONAL, INC.

GOFORTH LEWIS, LLP


By: _____
       Daniel O. Goforth
State Bar #08064000
Admitted in the Southern District
1111 Bagby, Suite 2200
Houston, TX   77002
(713) 650-0022
(713) 650-1669 Facsimile

LOCAL COUNSEL FOR DEFENDANT SCHENKER
INTERNATIONAL, INC.

-37-

Printed 2/21/2002, 8:52 PM
Path: pbT > Schenker Jourdan>Legal>MSJ

429

## CERTIFICATE OF SERVICE

Pursuant to Rule 5 of the Federal Rules of Civil Procedure, I hereby certify that a true and correct copy of the foregoing Defendant's Motion for Summary Judgment, supported by the Declaration of Michael Q. Carey, executed February 21, 2002, the Affidavit of Stephen R. Gifford, sworn to February 21, 2002, the Memorandum of Law (Motion for Summary Judgment), dated February 21, 2002, and a proposed Order, were forwarded to all counsel of record by Federal Express on this 21st day of February, 2002.

MICHAEL Q. CAREY

TO:

Nancy K. Strong, Esq.
McConn & Williams, L.L.P.
6700 J.P.Morgan Chase Tower
600 Travis Street
Houston, TX 77002

ATTORNEYS FOR PLAINTIFF

Daniel O. Goforth, Esq.
GOFORTH LEWIS, LLP
1111 Bagby, Suite 2200
Houston, TX 77002

LOCAL COUNSEL FOR DEFENDANT SCHENKER
INTERNATIONAL, INC.

425