IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| HILDA S. JOURDAN, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. H-1999-4081 |
| | § | |
| vs. | § | |
| | § | |
| SCHENKER INTERNATIONAL, INC., | § | |
| | § | |
| Defendant. | § | JURY TRIAL DEMANDED |

**DEFENDANT'S MEMORANDUM OF LAW**

(Motion for Summary Judgment)

CAREY & ASSOCIATES
Attorneys for Defendant
521 Fifth Avenue, Suite 3300
New York, NY 10175-3399
Tel.: 212-758-0076
Fax.: 212-758-0069

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................. III

    CASES ......................................................III

    Statutes ...................................................III

PRELIMINARY STATEMENT .............................................. 1

THE COURT HAS ORDERED THE SEALING OF CUSTOMER RECORDS .............. 1

HILDA JOURDAN'S CLAIM ............................................... 3

SCHENKER'S INVESTIGATION CONTINUED ................................. 6

STATEMENT OF FACTS ................................................. 7

    A.   THE SALES INCENTIVE PROGRAM ........................................ 7

    B.   JOURDAN'S EMPLOYMENT ............................................... 8

    C.   JOURDAN'S TERMINATION ............................................. 10

    D.   THE BARIVEN ACCOUNT .............................................. 11

        1)   THE BID FOR BARIVEN'S BUSINESS .................................... 11

        2)   THE IMPLEMENTATION OF THE BARIVEN BRANCH .......................... 12

        3)   SCHENKER RENEGOTIATED THE BARIVEN RATE AGREEMENT................... 20

        4)   BARIVEN WAS A GLOBAL ACCOUNT ...................................... 21

        5)   JOURDAN NEVER HAD HERSELF IDENTIFIED IN THE ACCOUNTING DEPARTMENT AS THE SALESPERSON FOR BARIVEN...................................... 23

    E.   BARIVEN WAS NEVER JOURDAN'S CUSTOMER ............................. 24

        1)   JOURDAN UNDERSTOOD HOW TO TAKE CREDIT FOR BARIVEN AS HER CUSTOMER — 98 SALES.......................................................... 24

        2)   JOURDAN KNEW THAT BARIVEN WAS NOT HER ACCOUNT...................... 28

        3)   JOURDAN NEVER COUNTED BARIVEN TOWARD HER 99 SALES GOALS ............ 32

        4)   JOURDAN SOUGHT A BONUS, NOT A SALES COMMISSION, FOR HER EFFORTS ON THE BARIVEN ACCOUNT ............................................... 38

ARGUMENT ..................................................... 43

POINT I ...................................................... 43

SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING JOURDAN'S CLAIM
FOR INCENTIVES ON THE BARIVEN CONTRACT ....................... 43

POINT II ..................................................... 45

JOURDAN WAS NOT ENTITLED TO INCENTIVES ON THE BARIVEN CONTRACT ..... 45

    A.   Management used its discretion in making bariven a global account ......... 45

    B.   Jourdan was not entitled to any Incentive on Bariven for 99 ............. 50

CONCLUSION ................................................... 52

# TABLE OF AUTHORITIES

**CASES**

Evans v. City of Bishop, 238 F.3d 586 (5th Cir. 2000)...................43

Fierros v. Texas Department Of Health, 274 F.3d 187 (5th Cir 2001) ........43

Jourdan v. Schenker Int'l Inc., 71 Fed. Appx. 308, 2003 WL
    21754963 at *1 (5th Cir. 2003)...................................5

Lone Star Steel Co. v. Scott, 759 S.W.2d 144 (Ct. App. Tx.,
    Texarkana 1988) ................................................46

S.E.C. v. VanWaeyenberghe, 990 F.2d 845 (5th Cir. 1993).................2

United States v. Lawrence, 276 F.3d 193 (5th Cir. 2001).................9

Vogel v. Veneman, 276 F.3d 729 (5th Cir. 2002) ........................43

**STATUTES**

Rule 56(c), Fed.R.Civ.P. ...........................................43

## PRELIMINARY STATEMENT

Defendant Schenker International, Inc. ("**Schenker**") moves for summary judgment dismissing Plaintiff Hilda S. Jourdan's Original Petition ("**Complaint**").[1]

## THE COURT HAS ORDERED THE SEALING OF CUSTOMER RECORDS

Because of the confidential and proprietary nature of the customer information raised by Jourdan's complaint, this motion is filed with portions sealed as provided in this Court's Confidentiality Stipulation and Order, dated April 5, 2001 ("**Stipulation**"). Among other things, the Stipulation stated that confidential documents shall be used solely for the purposes of this litigation and "for no other purpose whatsoever." (SI Ex Z: Stip at 2). The Stipulation also provided that "Judicial Personnel," including this Court and its staff, will be provided with a copy of the Stipulation and should "take reasonable precautions to prevent any disclosure of such information in any manner inconsistent with this stipulation." (SI Ex Z: Stip at 3). Finally, the Stipulation provided:

> Each Confidential Document and
> Confidential Information that is filed
> with the Court shall be submitted in a
> sealed envelope bearing the title of
> this action and shall be marked
> 'CONFIDENTIAL INFORMATION SUBJECT TO
> PROTECTIVE ORDER TO BE OPENED ONLY AS
> THE COURT DIRECTS.'

---

[1]     This matter was removed to this Court from the District Court of Harris County, Texas, 334 Judicial District, by Order dated _____, 1999.

(SI Ex Z: Stip at 4).

This Court has supervisory power over its own records and files and access to court records has been denied where access might be used for improper purposes. S.E.C. v. VanWaeyenberghe, 990 F.2d 845, 848 (5th Cir. 1993).

In deciding whether or not to seal the limited number of records sought to be sealed by Schenker, the Court "must balance the public's common law right of access against the interests favoring nondisclosure." S.E.C. v. VanWaeyenberghe, 990 F.2d at 848. In reaching a decision on a request to seal a portion of the record, the Court must consider the relevant facts and circumstances of this matter. Id. The Court must consider the presumption in favor of the public's access to judicial records and articulate why, in the balance, certain records should be sealed. S.E.C. v. VanWaeyenberghe, 990 F.2d at 849.

Here, the records that disclose customer identities, sales figures, gross profit calculations, and Schenker operations should be sealed to protect the proprietary nature of such information from disclosure to the competitors of Schenker.

This is a commercial lawsuit and there is no strong public interest in the information Schenker and plaintiff agreed to seal. On the other hand, disclosure could impair the competitive position of Schenker. A competitor of Schenker that learned of a customer's identity as well as of the sales volume and gross

profit on such sales, could use the information to compete unfairly with Schenker. (SI Ex R: Gifford Aff ¶ 8).[2]

## HILDA JOURDAN'S CLAIM

Hilda S. Jourdan sued Schenker in three causes of action for: 1) breach of contract (SI Ex A: Compl ¶ 10) ("**First Cause of Action**"); 2) promissory estoppel (SI Ex A: Compl ¶ 11) ("**Second Cause of Action**"); and 3) specific performance (SI Ex A: Compl ¶ 12) ("**Third Cause of Action**"). Jourdan sought damages of "at least $200,000" and Attorneys' Fees. (SI Ex A: Compl ¶¶

---

[2]    Citations preceded by "**Compl**" refer to the paragraphs and exhibit to the Plaintiff's Original Petition, filed in this matter in the District Court of Harris County, Texas, 334 Judicial District, #1999-51824, on October 15, 1999.

Citations preceded by "**MQC Decl**" refer to the paragraphs of the declaration of Michael Q. Carey, executed January 14, 2005 ("**Carey Declaration**").

Citations preceded by "**Gifford Aff**" refer to the paragraphs of the affidavit of Stephen R. Gifford, sworn to February 21, 2002 ("**Gifford Affidavit**").

Exhibits preceded by "**SI**" refer to exhibits submitted in support of the motion of Schenker.

Citations preceded by "**JJ Tr**" refer to the pages of the deposition transcript of plaintiff taken in November 2001, located at Ex S of the Carey Declaration. Single page and line ranges in such transcript are indicated in the following form: "JJ Tr 54:7-10."

Multi-page ranges in all deposition transcripts are indicated in the following form: "JJ Tr 54-58."  Multi-page and line ranges in such transcripts are indicated in the following form: "JJ Tr 54:7-10 -- 58:1-3."

Citations preceded by "**JJ2 Tr**" refer to the pages of the deposition transcript of plaintiff taken in July 2004, located at Ex T of the Carey Declaration.

Citations preceded by "**ME Tr**" refer to the pages of the deposition transcript of Manfred Engst taken in July 2004, located at Ex V of the Carey Declaration.

Citations preceded by "**MB Tr**" refer to the pages of the deposition transcript of Michael Bujold taken in November 2004, located at Ex U of the Carey Declaration.

Citations preceded by "**WB Tr**" refer to the pages of the deposition transcript of Walther Borchers taken in November 2001, located at Ex W of the Carey Declaration.

Numbers preceded by "**JJ**", e.g. "JJ001234" refer to documents produced by Jourdan. Numbers which are not preceded by JJ were produced to Jourdan by Schenker.

13 and 14).

Each cause of action in Jourdan's Complaint was based upon the allegation that she was due a commission, "[p]ursuant to the Sales Incentive Program" ("**Sales Program**"), related to sales to a customer of Schenker named Bariven S.A., a Venezuelan oil company ("**Bariven**"). (SI Ex A: Compl ¶¶ 8, 13). She claimed that the incentives related to sales to Bariven were owed "over the life of the" "five year contract." (SI Ex A: Compl ¶¶ 6, 8).

Jourdan also claimed that she had been promised incentives of "at least $30,000" by Schenker, pursuant to the Sales Program, for 1998 sales to customers other than Bariven. (SI Ex A: Compl ¶¶ 5, 9).

Schenker moved for summary judgment by Notice of Motion dated February 21, 2002. (MQC Decl ¶ 6).

After Schenker moved for summary judgment, Jourdan voluntarily dismissed her claim for the additional $30,000 in commissions for 1998. (SI Ex X: Order dated April 16, 2002 ("**Order**") at p. 10).[3]

The Court awarded summary judgment to Schenker and dismissed Jourdan's remaining claims under the First, Second and

---

[3]   In its Answer to Jourdan's Complaint, Schenker asserted a counterclaim against Jourdan for breach of a Promissory Note that Jourdan executed in favor of Schenker ("**Counterclaim**"). Jourdan also voluntarily dismissed her affirmative defenses to Schenker's counterclaim. The Court awarded summary judgment to Schenker on its Counterclaim. (SI Ex X: Order at p. 10). No appeal was taken by Jourdan.

Third Causes of Action. (SI Ex X: Order at p. 33-37).

Jourdan appealed the portion of the Court's decision dismissing her First Cause of Action. No appeal was taken from the dismissal of the Second and Third Causes of Action.

The Court of Appeals for the Fifth Circuit ("**Fifth Circuit**") concluded that there was at least a genuine issue of material fact regarding the meaning of the Sales Program with respect to whether and expressly at what point Jourdan had an accrued right under the plan to commissions on sales that had occurred prior to her termination, vacated the order of the Court and remanded for further proceedings. (SI Ex Y: <u>Jourdan v. Schenker Int'l Inc.</u>, 71 Fed. Appx. 308, 311, 313, 2003 WL 21754963 at *1, *3, *4 (5th Cir. 2003)). The Fifth Circuit affirmed the Court insofar as it dismissed Jourdan's claim for commissions on sales after her termination in November 1999. (SI Ex Y: <u>Jourdan</u>, 71 Fed. Appx. at 312, n. 5, 2003 WL 21754963 at *4, n. 5).[4]

This motion for summary judgment addresses the remaining portion of Jourdan's Complaint: her claim to commissions under the Sales Program related to the gross profit on sales to Bariven ("**Bariven Account**") ("**Sales Program Credit**") prior to

the date of her termination.

### SCHENKER'S INVESTIGATION CONTINUED

Pursuant to a document request from Schenker, dated September 15, 2000, and prior to her deposition in November 2001, Jourdan produced only 478 pages of records to Schenker (JJ000001 through JJ000478). The majority of Jourdan's documents, over 400% more (JJ000479 through JJ002794), were produced to Schenker on January 15, 2002, after Jourdan's deposition was completed. The production consisted of over 2300 pages of records related to Jourdan's employment with Schenker. (MQC Decl ¶ 5).

The scheduling order did not permit time to depose Jourdan again concerning the records produced on January 15 before Schenker's first motion for summary judgment had to be filed. (MQC Decl ¶ 7). Jourdan and 2 former officers of Schenker have since been deposed. In addition, the documents have been subjected to additional analysis. (MQC Decl ¶ 8).

The additional evidence establishes that the Bariven Account was a Global Account, as defined below, and that neither Jourdan nor any other employee was ever identified as the salesperson for the Bariven Account. In the absence of any proof

---

[4]     The Fifth Circuit did not address (1) whether Jourdan was assigned to the Bariven account within the meaning of the Sales Program; (2) whether Jourdan was actually ever fully removed from the Bariven Account, and (3) whether, and under what circumstances, Schenker had the right to remove a

that Jourdan was to be given credit for the Bariven Account,
there is no basis for her suit under the Sales Program and her
Complaint should be dismissed.

STATEMENT OF FACTS

**A.   THE SALES INCENTIVE PROGRAM**

Schenker adopted the Sales Incentive Program effective
January 1, 1998.[5] Jourdan received a copy. (JJ Tr 120:10-21).
Jourdan's suit for damages is based on the Sales Program.

The Sales Program states that the attached sales guidelines
govern incentives. (SI Ex D, p 4). The Sales Guidelines portion
of the Sales Program states that, after 30 months of employment,
a person must have gross profit of "4 times salary & fringe".
(SI Ex D, p 4). Jourdan's combined salary and fringe benefits in
1998 and 1999 were $87,500. (SI Ex E-1 #0053, E-2 #0072).

The Sales Program includes an example how to determine if
an incentive is owed to a salesperson. For 1998 and 1999, since
Jourdan had salary and fringe benefits of $87,500, she would
receive no incentive payment for the first 3 times $87,500 or
$262,500 of growth in gross profit ("**Sales Program Credit**").

---

sales representative from an assigned account." (SI Ex Y: <u>Jourdan</u>, 71 Fed.
Appx. at 309, n.2, 310, n. 3, 2003 WL 21754963 at *1, n. 2, *2, n. 3).
[5]      The Sales Program memo is dated May 29, 1998 but it states that it is
effective "immediately and retroactive to 1 January 1998." (SI Ex D, p 1).
      Attached to the Complaint (SI Ex A) as Exhibit A is a copy of the Sales
Program. It is reproduced as SI Exhibit D.
      The Sales Program attached to the Complaint did not have numbered
pages.  Each page of SI Ex D has a circled number added to facilitate
reference.

However, she would receive a 7% incentive on the amount of growth in gross profit that exceeded $262,500 (3 x) but was less than $350,000 (4 x), and a 10% incentive on the amount of growth in gross profit that exceeded $350,000 (4 x).[6]

## B.  JOURDAN'S EMPLOYMENT

Schenker is a freight forwarding company. (SI Ex A: Compl ¶ 5). It was in 1998 and 1999 a wholly owned subsidiary of Stinnes Corporation. (SI Ex R: Gifford Aff ¶ 2).

Jourdan was hired by Schenker in 1989 to work in the Houston Branch. (JJ Tr 49:9-10; SI Ex F-1 #0215). Over 8 years, through 1997, she was one of Schenker's most productive salespersons. (e.g., JJ Tr 272:15—273:4; SI Ex F-2 a-g #0043-0045, 0048-0050, 0052). In August 1995, Jourdan was promoted to Sales Manager of the Houston Branch. (SI Ex F-3 #0252).

Jourdan remained a sales manager in the Houston Branch of Schenker until she was promoted, prior to January 26, 1998, to Oil & Energy Projects Development Manager, a position in the Houston Branch. (See SI Ex K at # 3921-3922, #3924, JJ Tr 180:1-2.[7]

Walter Borchers was the branch manager of the Houston

---

[6]     The Sales Program sets forth the calculations in detail.  However, while the Sales Program presents a figure of $280,000 as the measure of growth in gross profit, the calculations actually use $330,000 ($150M + 50M + 130M) of growth in gross profit to calculate an incentive of $16,500. (SI Ex D, p 3).

branch and, on December 29, 1998, he recommended that Jourdan be transferred from the Houston Branch to Corporate Sales. Manfred Engst, Executive Vice-President and Chief Operating Officer of Schenker, approved the transfer on January 19, 1999. Initially, Jourdan worked under the supervision of Steve Wallack, head of Project Sales. (SI Ex F-4 #0263).

By April 19, 1999, Wallack advised Jourdan that she had repeatedly ignored his requests for a target list of potential customers, and current projects that she was working on. (SI Ex F-5 #0266).

Less than a month later, on May 12, 1999, Jourdan was placed under the direct supervision of Michael Bujold. (MB Tr 96:24-97:21; SI Ex F-6 #0267). Bujold was the Vice-President of Sales, Marketing and Public Relations. (MB Tr 7:27-8:3). Jourdan remained under the supervision of Bujold until her termination. (MB Tr 104:20-105:11).

Following her promotions, Jourdan nevertheless always worked from the offices of the Houston Branch, where Borchers continued to have indirect supervision of her (MB Tr 97:5-21).

---

[7]    Documents identified as business records in the Gifford Affidavit are admissible as evidence pursuant to Rule 803(6), Fed.R.Evid. United States v. Lawrence, 276 F.3d 193, 196 (5th Cir. 2001).

## C.   JOURDAN'S TERMINATION

Jourdan formed a relationship with her future husband, Craig Cosman, by 1999. In April 1999, Cosman was employed by Schenker in the Seattle Branch. On April 20, 1999, Jourdan wrote P. Robert Doernte, President and Chief Executive Officer of Schenker, requesting a transfer of Cosman to Houston. (SI Ex G-1 #0358). The transfer was not approved.

Jourdan then sought a transfer for herself to Seattle. She went over Schenker's head, directly to Schenker Germany for approval. As of August 13, 1999, Engst wrote Schenker Germany that he did not approve of Jourdan's transfer to Seattle. (SI Ex G-2 #0364).

On August 13, 1999, Jourdan was warned not to use Schenker's e-mail system for personal messages to Cosman and advised that Schenker did not approve of her transfer to Seattle. (SI Ex G-3 #0363).

On October 15, 1999, Jourdan filed her lawsuit. (SI Ex A)

Jourdan was terminated on November 9, 1999 for lack of productivity. (JJ Tr 467:21—468:1). She has stated that she was fired because Schenker wanted to save paying her a sales commission. (JJ Tr 258:12-259:4). Her claim is not supported by the record.[8]

---

[8]     Jourdan has not sued for wrongful termination.

### D.   THE BARIVEN ACCOUNT

#### 1)   The Bid For Bariven's Business

In 1997 (SI Ex A: Compl ¶ 6), Jourdan was assigned to an international team of at least 20 persons that was to make a bid for the global shipping business of Bariven. (SI Ex H-1 #3924-3935; JJ Tr 355-366). Jourdan described herself as the only person on the worldwide team who was employed by Schenker as a salesperson. (SI Ex A: Compl ¶ 6; JJ Tr 368:14-15; JJ Tr 384:13-17). At the time, Jourdan was the Oil and Energy Project Development Manager in the Houston Branch. (SI Ex H-1 at #3924). The team included managers and employees of a) Schenker International, AG, a German corporation ("**Schenker Germany**"), an affiliate of Schenker, b) the subsidiaries of Schenker Germany in Holland and c) in Caracas, d) the New York headquarters of Schenker, and e) the Houston Branch office of Schenker USA. (JJ Tr 355-366). Engst, Ian McGaffney and Ebi Van Snek, high ranking officers in the United States, Venezuela, and The Netherlands, respectively, reported directly to Schenker Germany on the progress of the bid. (SI Ex H-2 #3921-3922).

Schenker was awarded the business by Bariven. A lengthy document described by Jourdan as a five-year contract was signed by Schenker and by PDVSA Services, Inc. on behalf of Bariven, dated April 2, 1998 (**"Rate Agreement"**). (SI Ex A: Compl ¶ 6; SI

Ex H-3 #2332-2333).[9]

### 2)    The Implementation Of The Bariven Branch

In June 1998, two months after Schenker won the bid for the Bariven business, Schenker established a separate division within the company to service Bariven alone. The division was located in the same building as the Houston Branch, but it operated independently of the Houston Branch. (MB Tr 77:22-78:22).

On June 3, 1998, Schenker moved Patrick Jacob from headquarters in New York to Houston as head of the Bariven project. The announcement described the project as "the single largest project undertaking in Schenker history." (SI Ex I-1 #JJ000126). Later, the project was designated the "PDVSA Division," apparently named after the corporate agent of Bariven that signed the Rate Agreement. (Hereafter the "**Bariven Branch**"). (SI Ex I-2 # 07026-27).

Jacob began to assemble his team in June 1998. On June 4, in a message to Engst, Jacob noted that no one had announced that Jacob had replaced "Ian B." as the person "in charge" of the project. Jacob also noted that Jourdan was still, correctly,

---

[9]    The document was not a contract that bound Bariven to ship any goods through Schenker Worldwide and its subsidiaries.  The Rate Agreement stated at page 1:

> WHEREAS, to avoid repetitive negotiations,
> BARIVEN desires to establish an agreement
> defining terms and conditions applicable when
> BARIVEN does business with [Schenker] after the

the main focal point "because she has most of the knowledge at this time" and keeps Jacob informed. He stated:

> This is not good enough, from now on all communication, has to be addressed to myself and I together with Ruby Newmans and Jolie Jourdan will take care of scheduling/prioritizing of all aspects as a team with me being the focal point.
>
> This is essential for me to get up speed in no time as required! (SI Ex I-3 #2148).

Prior to Jacob's arrival, on May 20, 1998, Jourdan advised Engst that she and Ruby [Newmans] in the Houston Branch were involved in meeting with vendors, including carriers, inspection companies and expediting companies. She also advised Engst that she was involved in hiring the staff needed to handle the Bariven Account. (SI Ex I-4 #0949). Jourdan claims that she continued to work with the team that was assembled under Jacob's leadership. (JJ Tr 384:18—385:5).

On June 10, Schenker Germany wrote Engst concerning Jacob's appointment as Bariven Project Manager:

> All other in the [Bariven] project involved people like Jan Hoelterling, Jolie Jourdan, Walter Borchers, etc. have to do their utmost to support Patrick and make this whole exercise a success.
>            ***
> [T]he [Bariven] operation is an immense task not only for the Houston office but for the whole US organization.

---

Effective Date….. (SI Ex H-3 # 2333).

> Patrick, to our point of view, is the
> key factor for a success. It is very
> important that one person has the clear
> picture of all activities…. (SI Ex I-5
> #2145-2146).

The author of the message closed by stating that "I have discussed with the Board of Management that we will not finalize our [Bariven] report until the whole operation is set up and running." (SI Ex I-5 #2145 at 2146).

The Bariven Division was established by corporate accounting on June 9, 1998, (SI Ex I-2 #07026-27). At that time, Jourdan was assigned as the Oil & Energy Projects Development Manager in the Houston Branch and she was not an addressee of the e-mail used to open the "[Bariven] Division." (SI Ex I-2 at #07026).

On July 5, 1998, Jacob objected to his office being carried as a department under the Houston Branch. In a message to Engst alone, Jacob mentioned inflated forecasts and holes in the pricing plan, matters he attributed to the "local mind set and attitude…." He closed his message by stating:

> I kindly request you to make "PDVSA-
> 158" a Branch within a Branch and not a
> Department with separate reference
> numbers otherwise myself and my team
> will be limited in decision
> making/authority here locally around
> the nation and on a worldwide basis.
> (SI Ex I-6 #0569).[10]

---

[10]    Two months later, on August 4, 1998, the existing Bariven account numbers were changed. (SI Ex I-7 #7016-18).

Jourdan was never assigned to the Bariven Branch as a salesperson or in any other capacity (MB Tr 27:21-28:10) but she did know that Bariven was established as a division or branch separate from the Houston Branch. (JJ2 Tr 132:12-133:9). Indeed, she has never claimed that she was a part of the Bariven Branch. As noted above, on January 1, 1999, she was transferred from the Houston Branch to Corporate Sales at Schenker Headquarters in New York.

Jourdan assisted from the outside, as many non-branch employees did, advising Jacob on establishing the Bariven Branch. For example, on July 17, 1998, Jourdan wrote a critical memo to Jacob, copied to Borchers and Engst, telling him he had to assign someone to be responsible for "Out-ports", stating the area could not be ignored any longer. She also criticized Jacob for failing to give 16 of his 20 person staff a copy of standard operating procedures, the Basic Service Requirement, disagreeing with Jacob's assessment that the employees did not need the memo. She told him the situation with the expediters was "unacceptable" and recommended that he give greater attention to negotiating better rates from the carriers. Jourdan closed with a request that she be given a significant role on the Bariven Account:

> Patrick, I want you to succeed. I want
> Schenker to succeed. My only point is
> that we have to do this together.
> ***

- 15 -

> I am committed to this account and to
> Schenker, as I am certain you are. I
> would like to contribute to this effort
> not simply by <u>doing odd little jobs on
> the side</u>. I feel I can be valuable to
> you by directly interacting with your
> group and communicating to them what I
> was able to learn during the course of
> the tender and the many implementation
> meetings I attended. I don't want to
> just criticize, I am more than anxious
> to help you in resolving the above
> issues. (SI Ex I-8 #JJ000134-136)
> (emphasis added).

The same day, Jacob wrote Borchers that his team had no
time to negotiate carrier rates. (SI Ex I-9 #JJ000137).

The next day, on July 18, Jourdan wrote Jacob another memo,
copied to Borchers and Engst. She noted that at a meeting the
previous day, Bariven personnel expressed a desire that Jourdan
"not only continue on [Jacob's] team but to have direct input to
the set up of the processes." Jourdan told Jacob: "I very much
appreciate your support at the meeting in my being your "keeper"
for the Expediters. I will draw up my plan and present it to you
immediately…." (SI Ex I-10 #JJ000138).

Less than 5 weeks later, on August 21, 1998, Jourdan was
informed that she was "no longer to be involved with [the
Bariven Account] but to go back and pursue [her] sales efforts.
(SI Ex I-11 #JJ000144-149 at 148).

Three days after being barred from working on the Bariven
Account, about 5 weeks after her lengthy, critical July 17 memo

- 16 -

to Jacob, Jourdan wrote another memo critical of Jacob, a 6 page, single-spaced memo to Engst, copied to Schenker Germany, Borchers and Jacob, dated August 24, 1998 (**"JJ August 98 Memo"**). (SI Ex I-11 #JJ000144-149). The memo was written to address "issues that are impeding the progress and overall operational success of this department." (SI Ex I-11 #JJ000144). Jourdan attached her July 17 letter and remarked that she had not yet received any "feedback or comments." She clarified that the data for the July 17 letter was "based on a peripheral involvement on my part…." Id. Jourdan closed the letter by stating, in apparent reference to her July 17 assignment as "keeper" of the expediters:

> Expediting being one of the most critical [areas], it can not be left to chance.
>
> I look forward to your guidance on how we can proceed together on successfully handling the set up of this account — as to be quite honest with you — I believe that this is not the proper time for me to just walk away from this as I believe all resources must be utilized to guarantee the success of the handling of this account and our future in this industry. (SI Ex I-11 #JJ000144 at 149) (emphasis added).[11]

Engst replied to Jourdan the same day, August 24. His

---

[11]   The JJ August 98 Memo is the source of the confirmation that Jourdan was barred on August 21 from interfering with the Bariven Branch for all purposes. In her memo, she wrote:

> …I was advised by Ms. Elaine Stevens on August 21, that I am no longer to be involved with this account but to go back and pursue my sales efforts. (SI Ex I-11 #JJ000148).

message was copied to Schenker Germany, Borchers and Jacob.
Engst wrote:

> Our ship, the [Bariven] Department in
> Houston, is drifting because we seem to
> have more than one captain.
>
> I agree, Patrick needs support, but it
> is an impossible situation that
> decisions, changes are being made
> without his input.
>
> Like Anke [Wandel] or Daniel [Lumpert],
> you should assist by reviewing
> functions. If you think there are
> improvements that can be made in
> certain processes, you should discus
> that with the captain, Patrick Jacob
> and, if both of you agree, he will
> implement them. (SI Ex I-12
> #JJ000150).[12]

Jourdan attended another meeting with management and
personnel from Bariven, on August 26, 1998, a follow up to a
meeting she attended on July 17 (SI Ex I-10). She attended with
a number of other employees who were assisting the Bariven
Branch but not part of it. (SI Ex I-13 #JJ000151-164).

Patrick Jacob found Jourdan's activities counterproductive.
He complained that Jourdan was making his job difficult because
she was interfering with his supervision of the Bariven Branch.
On the same day as the follow up meeting with Bariven personnel,

---

[12]     Engst was telling Jourdan that she could assist from the outside, like
Wandel and Lumpert. Wandel and Lumpert were each in the head corporate
offices. (MQC Decl ¶ 10). An organization chart of the Bariven Department,
dated August 26, 1998, did not list Jourdan, Wandel or Limpert as part of the
department. The organization chart also makes no reference to any salesperson
as part of the branch. (SI Ex I-14 #JJ000165-166).

on August 26, 1998, Jacob wrote Engst:

> [A] brand new staff … is being
> undermined on a daily basis.
>
> This is exactly what we do not need and
> the memos you've gotten from Jolie are
> good examples, this person is not
> capable nor willing to understand the
> scope and financial ramifications her
> and others action have brought along
> for Schenker International on a
> worldwide basis on this project.
>
> Even worse, after you've instructed
> Elaine Stevens to let her know to
> withdraw herself from the account
> (which happened Friday 8/21) the
> following was brought to my attention
> by individuals of my staff:
>
> Jolie Jourdan approached one of my
> expediters on Friday afternoon and
> asked them to put in writing addressed
> to management their support on her
> behalf in order to stay involved in
> this project.
>
> I cannot … accept that kind of
> undermining and I herewith ask you to
> reiterate your decision and have here
> (sic) removed from any activities on
> this project effective immediately and
> permanently. (SI Ex I-15 #0581).

Two weeks later, on September 15, 1998, Borchers, Houston

Branch Manager, gave Jourdan a 95%, "outstanding" rating in her

annual appraisal. (SI Ex I-16 # JJ000173-174). In her [undated]

reply, Jourdan confirmed her "distress" at being denied any

further role regarding Bariven:

> I believed that my opinions/input was
> always take[n] valuable and held in
> esteem. I have lost this confidence and

— 19 —

> I am very discouraged. … I do love
> developi[ng] traffic for Schenker, but
> am concerned that I am really not taken
> seriously and as a consequence, when
> the account or project is closed that I
> can not bring any value to the
> ac[count]. I want to be a part of a
> team, part of a team that wants me as
> well (for all of the pote[ntial] that I
> have). Thank you for this opportunity
> [to] express my distress. I will
> continue to g[ive] our sales efforts
> 100%, and do my best for Schenker. (SI
> Ex I-16 #000173 at 174).

Jourdan's salary was increased from $70,000 to $72,000 effective November 1, 1998. (SI Ex I-17 #0246).

Borchers recommended on December 29, 1998 that Jourdan be promoted from Houston Branch sales to Corporate Sales. Engst approved that transfer on January 19, 1999. (SI Ex F-4 #0263).

### 3)   Schenker Renegotiated The Bariven Rate Agreement

Jourdan expected there would be losses before the Rate Agreement was executed. (JJ Tr 397:23-398:21). By August, 1998, only 4 months after the Rate Agreement was signed, in the same month that Jourdan was barred form the Bariven Branch, Schenker determined that the account was losing money and that it would lose substantial amounts annually if the rates were not renegotiated. (SI Ex J-1 #3542-45).

The rates were renegotiated under the supervision of Manfred Engst (ME Tr 55:14-56:17), beginning on August 18, 1998. (SI Ex J-1 #3542-45). The process did not end until 1999. (ME Tr

13:7-14:13). Jourdan was not part of the team that renegotiated the new rates. (JJ Tr 394:14-395:8).

### 4)   Bariven Was A Global Account

Jourdan understood that when an account was a Global Account, no salesperson or any other person was credited for purposes of the Sales Program with sales to that account. (JJ Tr 266:5-9).

No witness supports Jourdan's claim that Bariven was her customer. Those most knowledgeable about the matter, Engst as the global head of the Bariven Account, Borchers, her manager in the Dallas Branch, and Bujold, to whom she reported directly in 1999 when Bariven began to show some profit, each denied that Bariven was Jourdan's customer.

Borchers testified that Bariven was a worldwide, multi-national, global account. (WB Tr 44:4-45:16).

Engst testified that Bariven was a global account. (ME Tr 79:23-80:3).

Bujold testified that it was a house account (MB Tr 21:8-16) or corporate account. (MB Tr 27:21-28:10; SI Ex O-18 # JJ000175).

Finally, current management confirmed in 2002 that Bariven was treated as a "house account." (SI Ex A: Compl ¶ 8; SI Ex R: Gifford Aff ¶ 13). (collectively "**Global Account**").

Bariven was treated as a Global Account from the initiation of Schenker's bid. At the time the bid was made to Bariven, in late 1997, Jourdan informed Engst that the bid team had identified Engst in the bid as the "global account manager." (ME Tr 18:11-25). Consistent with the account being a Global Account, the Rate Agreement was signed by Engst. (SI Ex K-1 #2332-33, 33A).

For a meeting with Bariven on January 26, 1998, called to discuss technical issues with a Bariven evaluation team (SI Ex K-2 #3921-3922), a presentation binder was prepared for the meeting. (SI Ex K-3 #3924-3935). The first page of the binder, called the "Participants list", identifies Engst as the "Global Focal Point" and Jourdan as the "Oil and Energy Projects Development Manager."

Jourdan received a memo entitled "Budget 2000," dated 06/21/99, for the Houston Branch. The budget stated with respect to "[Bariven] implementation" that the Houston Branch did not achieve it because of a "corporate take-over." (SI Ex K-4 #JJ000363). In other words, the budget stated that Bariven was a "Global Account" not subject to consideration for Sales Program Credit. And it was taken over from the Houston Branch when the Bariven Branch was created in June 1998. (See Statement of Facts D-2).

Jourdan has not claimed that the Bariven Account was

mistakenly or otherwise credited to another salesperson. There is no evidence, not even a claim, that any salesperson received credit for Bariven under the Sales Program. Thus, the treatment of Bariven as a Global Account is unchallenged.

### 5)   Jourdan Never Had Herself Identified In The Accounting Department As The Salesperson For Bariven

Between June 5 and June 9, 1998, Jourdan was copied on or authored several e-mails that addressed the new account opening. (SI Ex L-1(a) #JJ000199, L-1(b) #07019, L-1(c) #JJ000209, L-1(d) #JJ000200, L-1(e) #JJ000210, L-1(f) #JJ000208). Jourdan was not identified as the salesperson for Bariven in any of that correspondence.

Schenker required that forms be completed to open a new account. (MB Tr 72:16-73:15; JJ Tr 317:19-318:4). The account opening forms were then transmitted to Norfolk Virginia where Schenker maintained its accounting operations. (JJ Tr 317:19-318:4). Consistent with that policy, Jourdan completed the forms to open the Bariven account and gave them to Alexis Cruize. Jourdan was not identified as the salesperson in any part of the form. (SI Ex L-2 #07023-25; JJ2 Tr 137:19-139:21). Cruize, in the accounting department, made the request to open the account. (See e.g. SI Ex L-1(b) #07019). It was signed by Dieter Kasprzyk, Chief Financial Officer. (SI Ex L-2 #07023-25). No account opening form identified Jourdan as the salesperson.

Two months later, on August 4, 1998, the existing Bariven

- 23 -

account numbers were changed at the request of Cruize. To document the change, three new "Customer Maintenance Request Form[s]" were completed. The forms used were a recent revision of the printed forms used in June to open the Bariven Account. The revised forms provided blocks to insert the "Salesperson Initials" and "Salesperson Name." Each was signed with those blocks empty. (SI Ex I-7 (a-c) #07016-18).

**E.   BARIVEN WAS NEVER JOURDAN'S CUSTOMER**

Not only did Jourdan know that Bariven was a Global Account, but also she never claimed it as her customer.

### 1)   Jourdan Understood How To Take Credit For Bariven As Her Customer — 98 Sales

Jourdan understood how to assure that she received credit for her customers. (e.g., JJ2 Tr 103:19-107:18; JJ2 Tr 131:22-132:11). Indeed, she had been arranging for such credit over her 10-year history with Schenker. Her failure to establish such credit for Bariven confirms that she never considered it to be her customer.

In October 1998, all salespersons were urged to complete forms required by Schenker management to properly record the customers for which they were to receive Sales Program Credit. (SI Ex M-1 #JJ000009-10). Jourdan maintained over 320 pages of personal records of her sales in 1998. None of those records make any reference to Bariven as Jourdan's customer. (MQC Decl ¶ 9).

Jourdan received a report of the amount of the gross profit growth on which her incentives for 1998 would be calculated and concluded "there is a great disparity in the final tally." (SI Ex M-2 #0053-54, 0058-59). However, Jourdan had not submitted all the information that she had been asked to submit prior to the publication of the report. (JJ Tr 204-205; SI Ex M-3 #JJ001459).

On March 1, 1999, Jourdan reported to Corporate Accounting in New York that she was delayed in submitting her paperwork (SI Ex M-4 #JJ000280-281). The reply on March 2, 1999 stated that 1998 was closed and that the report was due in June 1998. (SI Ex M-4 #JJ000280-281). Jourdan replied that an extension was authorized and that, in reference to her customers, Norfolk had

> all the account numbers assigned and in the system as of today's date which will allow for you to track and confirm. I have the form to complete on new accounts for 99 and will update accordingly.
>     In the meantime, I do look to resolve the 1998 issue. (SI Ex M-5 #JJ000279) (emphasis added).

Among other things, this memo establishes that Jourdan knew each salesperson was to record even new customers in the system, before it was known whether or not they would be profitable.

Rothe and Andrew Dancescu, employed in the accounting department for Schenker, were assigned in 1999 to audit Jourdan's 1998 sales figures. (e.g., JJ Tr 210-212; SI Ex M-3

#JJ001459; SI Ex M-2 #0053).

By March 17, 1999, Dancescu determined that Jourdan had to have growth in gross profit exceeding $262,500, before she would be entitled to an incentive under the Sales Program. Dancescu noted that Jourdan's total growth in sales for 1998 was only $236,381, short of what she needed to earn an incentive. (SI Ex M-2 #0053).

Approximately 1 week later, on March 23, 1999, Jourdan informed Robert Doernte, the President and Chief Executive Officer of Schenker, and six other officers in management or accounting, including Engst, plus Susan Ferraro, the head of Human Resources, that she had been working with Dancescu to resolve the differences in his and her numbers for 1998 sales growth. Having determined that she was not identified in the system as the salesperson for several customers (JJ Tr 152:19-25; SI Ex M-2 #0058-59), Jourdan attached a list of specific items that were in question ("**Jourdan Spreadsheet**"). (SI Ex M-6 #JJ001421-1424).

On the next day, March 24, 1999, Jourdan reported that she and Dancescu were "now on the same page" regarding the numbers audit. Her memo reflected that "<u>Norfolk has corrected several accounts to credit her with the customer</u>." (SI Ex M-7 #JJ000337) (emphasis added). Jourdan added that "[s]pecial recognition should go to [Dancescu] who was very helpful and patient in

explaining and working thru this process with me….” (SI Ex M-7 #JJ000337).

On March 24, 1999, Jourdan also wrote:

> I am still trying to get all my records caught up and straight <u>for the accounts that should be assigned to me</u> and in going through this I realized that I did not mention a few minor accounts that may have shipped something last year. (or that are recently new)
>
> ***
>
> …[I]f you could help me in getting the following accounts assigned in the system I would be very grateful.
>
> [list of 6 accounts]
>
> Shell Oil … this has now changed to Equilon but operations has two account numbers
>
> also pending assignment are Enron and Weatherford …. Please confirm. (SI Ex M-8 #JJ000331) (emphasis added).

On the same date, Jourdan advised Doernte of several reasons why she had not received credit for customers now correctly listed in Norfolk as her customers, making specific reference to accounts that Norfolk corrected (SI Ex M-7 #JJ000337)

None of the e-mails related to account assignments make any reference to Bariven. Jourdan simply did not seek credit for Bariven.

Approximately one week later, on March 30, 1999, Mike Bujold, later to become Jourdan's immediate boss (see SI Ex M-13 #JJ000339), informed her that her sales credits for 1998 were finally determined. He explained that the initial calculation of $236,381 in gross profit sales growth was increased by $111,532.85 to total growth of $347,913.85. He also said that Jourdan was entitled to a $5,979 incentive payment, subject to the approval of management. (SI Ex M-9 #JJ000339) Jourdan confirmed its receipt. (SI Ex M-14 #000347).

### 2)   Jourdan Knew That Bariven Was Not Her Account

The documents in this case establish that Jourdan was a prolific writer and an assertive salesperson. Indeed, she wrote extensively in relation to Bariven. Yet there is no document that indicates that anyone at Schenker ever considered Bariven as Jourdan's customer. More striking, there is no document that indicates that Jourdan herself considered Bariven as her customer. (e.g., JJ2 Tr 107:7–108:21).

Bariven was always, as noted above, a Global Account, for which no salesperson received credit under the Sales Program. Jourdan knew this from the outset when she designated Engst as the Global Account Manager. (ME Tr 17:11-16).

In her Complaint, Jourdan states that she was the "sole sales representative from the United States on the team that worked this account that was responsible for bringing Bariven to

- 28 -

Schenker…." (SI Ex A: Compl ¶ 6). However, in the Complaint, Jourdan does not allege that she was ever credited as the person who would receive Sales Program Credit for Bariven.

Nor has Jourdan testified to that effect. Jourdan never told anyone Bariven was her customer. Jourdan claimed "Everybody knew that I was the salesperson for [Bariven]." (JJ2 Tr 274:12-13). There is no evidence to support her claim. The evidence, including Jourdan's own correspondence identified below, and her deposition testimony, consistently points to the contrary:

> A.    I did not come close to my target in 1999 without [Bariven].
>
> Q.    And since you were the salesperson for [Bariven], I would assume you would have told them add the numbers for [Bariven].
>
> A.    Everybody knew that I was the salesperson for [Bariven]. Everybody knew that I should have had credit for PDVSA.
>
> Q.    So for that reason you felt you didn't feel you had to mention it?
>
> A.    Yeah, I happened to trust them.
> *** (JJ2 Tr 274:6-19).

Jourdan knew that Schenker did not rely on the salesperson to trust the company to properly assign credit for customers of theirs. As she knew when she was correcting the customers credited to her for 1998 sales (See Statement of Facts E-1), Schenker had a simple procedure for assuring that customers were properly credited to its salespersons. That procedure required

the salesperson to submit written forms that identified the customer and the salesperson's identity, or to contact Norfolk accounting if they later learned the account was not properly credited. Jourdan has never claimed she did either one regarding Bariven. (See Statement of Facts D-5 and E-1).

No record was ever made by Jourdan or Schenker that indicated Jourdan was the salesperson to be given Sales Program Credit for Bariven. When she received her monthly reports of her customers for the year 1998, Bariven was not listed as one of them. (JJ2 Tr 148:13-149:3).

Jourdan explained that she did not mention Bariven as her customer because she believed it was not profitable. (JJ2 Tr 108:22-111:6). That explanation does not appear in any of the documentation produced in discovery. To the contrary, documents created by Jourdan or the company list customers that lost money and were not profitable and Jourdan conceded that the monthly reports listed her customers whether they were losing money or were profitable. (JJ2 Tr 149:4-20). When Jourdan was pressed by Schenker regarding her sales, she provided a list of all her customers including those that were lost to the competition (SI Ex N-1(a) #0410-0413, #JJ001136). Jourdan's list was presented as comprehensive and would have listed Bariven if she considered it to be her customer. She failed to list it.

Jourdan's explanation that she did not list the Bariven

Account because it was not profitable is also undermined by her failure to list it after it did become profitable. Jourdan produced records showing that Bariven was profitable by a substantial amount in April 1999, May 1999 and June 1999, and for part of July, contributing to the total Gross Profit for January to July 7, 1999 in an amount over $1,000,000 (SI Ex N-2 #JJ000172. That is the amount claimed by Jourdan in the Complaint as the base for calculating her Sales Program Credit, the total being as of a month-end nearly 2 months before she wrote that she had heard a rumor to that effect. Indeed, the documents are dated in June and July, 1999. Even after hearing the rumor, Jourdan did not claim that Bariven was her customer. As noted above, she then asked if she had to do anything more to get sales credit than to follow the established procedure that she mentioned in the September 99 E-Mail. (SI Ex N-3 #JJ000175). And there is no evidence that, concerned then about receiving credit, she contacted Norfolk accounting to have the account assigned to her.

Jourdan's actions regarding Bariven's profitability are also inconsistent with any belief that Bariven was her customer. She failed to have the customer credited to her in early 1999 when she was correcting all the records regarding her clients regarding her 98 sales commission and she never took the necessary steps afterwards to do so. Her claim to have relied on rumors is also inconsistent with a claim that Bariven was her

- 31 -

customer. A salesperson does not have to rely on rumors regarding her customers' sales. Jourdan does not claim that she relied on rumors to determine the commissions she was owed with respect to any other customer.

Schenker generated monthly reports of sales for the branch manager and the salesperson to review, showing the customers credited to the salesperson and the "gross Profit" credited to each customer. No such reports were ever generated for Bariven that showed Jourdan or any other salesperson as the person to receive Sales Program Credit for Bariven.

### 3)   Jourdan Never Counted Bariven Toward Her 99 Sales Goals

In early 1999, Jourdan was employed under Stephen Wallack in Project Sales. At a Sales Meeting on March 15, 1999, Jourdan listed "Old position Responsibilities - As per Account List" and stated "Maintain existing accounts." (SI O-1 #0182). On March 16, 1999, Jourdan forwarded to Wallack her list of "accounts [Jourdan] wanted the local Houston sales department to be aware that Projects [Jourdan] was calling on." The list included active accounts of Jourdan, and potential customers. (SI Ex O-2 #0179-0181). Bariven was not on the list. Later, on 4/22/99, she described the list as containing "each and every account we are currently working on…." (SI O-3 #0178). (Note the document is dated April 22, 1998).

Bujold wrote on June 14, 1999, 5 months before Jourdan was

— 32 —

terminated, that her sales credit annualized to date was only $6,200, less than 10% of her salary and benefits and far below the toal growth in Sales Program Credit that she needed for a Sales Program incentive. (SI Ex O-4 #JJ1336).

Eleven days later, on June 25, 1999, Bujold wrote Jourdan again. He said that her 1999 sales were below target, then at $23,942 of an annual goal of $262,500, the same goal used in 1998 to calculate the minimum growth in gross profit needed to trigger an incentive payment. He added that her downward trend in sales growth, to $347,000 in 1998 needed to stop and he offered her his total support. (SI O-5 #0366).

Bujold took his $23,942 total from Jourdan's Sales Results Summary, printed 6/18/99, a list of Jourdan's customers by name and gross profit year to date. The list included several customers with zero gross profit in 99 and made no reference to Bariven. (SI O-6 #0070). In Jourdan's reply the same day, she made no mention of Bariven, despite saying that "I believe that once the results will be tallied for this year we will not be disappointed." (SI O-7 #0073).

Bujold repeatedly pushed Jourdan in writing to focus her efforts, demanding that she write and rewrite an effective business plan. On August 5, 1999, Bujold told Jourdan her "sales numbers … remain extremely far below our requirements…." He closed his memo:

Additionally by 12aug99 you can provide
me with your business plan as to how
you will achieve your sales
requirements for 1999…. (SI O-8 #0348).

Jourdan provided a lengthy reply to Bujold, dated August 6,
1999, in which she explained that her 98 sales results were off
"because of my involvement in [Bariven] from December 1997 at
the tender stage up to the April 6 award date and implementation
throughout 1998." Jourdan closed by stating " I will certainly
comply with your request to provide a business plan detailing my
strategy for overcoming these low figures…. (SI O-9 #JJ001149-
50). Jourdan did not claim in her reply that Bariven was her
customer and that she expected to add to her sales credit based
on Sales Program Credit for Bariven.

On August 16, Bujold stated that he was reviewing Jourdan's
business plan. (SI O-10 #JJ001146). Jourdan's Business Plan 1999
did not contain any reference to Bariven as her customer. (SI O-
11 #0183-0203). The next day, Bujold rejected Jourdan's business
plan and directed her to submit a revised plan by August 25. (SI
O-12 #JJ001144-45). Bujold noted that "[y]our sales pipeline
will be dry unless you hit a 'gusher'…." (SI O-12 at JJ001145).
Despite Bariven being in the category of a potential "gusher",
Jourdan never included it in any correspondence or sales plan as
one of her customers.

On August 17, 1999, Jourdan presented lists of current and
potential customers to Lana Warren, an assistant Branch Manager

of the Houston Branch. She made no mention of Bariven as a customer for which she would receive Sales Program Credit. (SI O-13 #0410-413).

On August 18, 1999, Jourdan replied to Bujold's request for a revised business plan. (SI O-14 #0085-86). Again, she made no mention of Bariven as a customer for which she would receive Sales Program Credit. Bujold replied to Jourdan immediately. By e-mail dated August 20, 1999, he repeated his earlier observations, including that Jourdan needed a "gusher a major customer to help achieve the sales numbers you need…." (SI O-15 #JJ001139-41).

On August 27, Bujold acknowledged receipt of Jourdan's revised business plan but said it disappointed him. He stated he was concerned how Jourdan would achieve the needed sales numbers. (SI O-16 #JJ001138) Jourdan replied to Bujold but did not mention Bariven as her account. (SI O-17 #JJ001136-37).

Jourdan was never credited as the salesperson on Bariven and she makes no claim that she was.  In late August, or on September 1, 1999, Jourdan wrote to Bujold regarding Bariven:

> Since I was actively working on this account for over one year, why have I not received any credit? Is it simply a matter of getting the acct. no. assigned on the form in Norfolk? (SI Ex O-18 #JJ000175 **"September 99 E-Mail"**)

Jourdan's message confirmed that she knew Bariven was not

credited to her. It also confirmed that she knew that the
process to have it credited to her was to contact the Norfolk
accounting department and that she had not previously sought
Sales Program Credit on Bariven. Jourdan did not claim, then or
at any previous or subsequent date, that she believed that she
was entitled to either full or partial Sales Program Credit on
Bariven. Not once did Jourdan refer to Bariven as her customer
in any business plan or correspondence even though Schenker's
largest account in history had been renegotiated to turn a
profit.

In an e-mail to Warren on September 29, 1999, Jourdan
stated:

> Shell/Equilon as well as Mobil are
> accounts that are under my care, even
> though operations does the direct day
> to day maintenance and supervision. (SI
> O-19 #JJ001287).

Jourdan never made any claim that Bariven was under her
care.

On September 30, 1999, Bujold sent to Jourdan a list of all
her accounts, showing the amount of year-to-date Sales Program
Credit for each customer of Jourdan, in some cases showing zero
if there were no profit under that customer. The report did not
list Bariven (PDVSA). (SI O-20 #0325-0326, 0344-0345 [partial]).
Jourdan never demanded that Bariven be included as her customer.

Jourdan demonstrated when she fought for her 1998 sales

credit and commission that she knew how to protect a commission
and a customer. Jourdan claims that after she was told by Bujold
that she would not receive any credit for Bariven because it was
a Global Account, that she tried to telephone Doernte and Engst
but that neither one would return her calls. (JJ2 Tr 207:18-
208:3). Despite being a talented and prolific writer, Jourdan
never wrote to anyone, not even Bujold, to question or to object
to what Bujold told her in the September 99 E-Mail: that Bariven
was a Global Account.

In October, 1999, Jourdan again confirmed her understanding
of how to protect a commission. Two weeks after Jourdan filed
her lawsuit and two weeks before she was terminated, Doernte
removed Jourdan from 2 of her largest accounts: Halliburton and
Equillon/Shell. (SI Ex O-21 # JJ001290). In response, she wrote
to Doernte that she wanted nevertheless to get sales credit for
sales on each of the accounts. (SI Ex O-22 #JJ000494). Bujold
assured her that she would receive such credit. (SI Ex O-23
#JJ000493).

Even when she was expressly writing to the president of
Schenker concerning credit for sales on Halliburton and Shell,
after she had commenced this suit, she failed to question the
decision by Schenker that no salesperson would receive Sales
Program Credit for Bariven.

A June 18, 1997 memorandum from McGaffney to Doernte,

— 37 —

Borchers, and Jourdan, among others contained a handwritten note from Doernte telling JJ to "**take ownership**" of Bariven as a prospective customer. (SI Ex O-24 #JJ000479-480). At the time, Schenker had not set up a team to bid on Bariven's global business. Even if that note made reference to the bid to obtain the global business of Bariven, which Jourdan has said she began to work on in December 1997, six months after the "take ownership" comment, the facts demonstrate that Jourdan never made an ownership claim on the Bariven Account until after she commenced this lawsuit. Thus, the Court's earlier determination that the note raised a genuine issue of ownership of the Bariven account for trial (SI Ex X: Order at 34), is, with the more complete record now before the Court, insufficient to raise a material issue of fact that would warrant denying summary judgment in Schenker's favor. (SI Ex X: Order at 37). In the two years following that ambiguous note by Doernte, there is no evidence that Jourdan ever documented any action to take ownership of the Bariven Account as her own customer for Sales Program Credit.

### 4)   Jourdan Sought A Bonus, Not A Sales Commission, For Her Efforts On The Bariven Account

As Bariven was Schenker's single largest customer account (JJ Tr 257:6-23), Jourdan sought a discretionary bonus because she knew she was not assigned to the account as the salesperson who was to receive Sales Program Credit for Bariven.

Jourdan's claims in her lawsuit encompassed claims, now dismissed, that sound in discretionary bonus, related to her participation in the bidding and implementation process on the Bariven account. Her quest for a bonus was consistent with knowing that Bariven was a Corporate Account on which no salesperson would receive Sales Program Credit.

Jourdan's claim in her Complaint that Manfred Engst promised her "When we make money, you make money," or words to that effect, is not a statement consistent with the Sales Incentive Program. Jourdan may have interpreted that comment as a promise of a discretionary bonus, if the account became profitable. But Jourdan's expectation, if she had one based on Engst's statement, was not related to the Sales Incentive Program.

Jourdan asked Bujold whether or not Bariven was profitable when she wrote him the September 99 E-Mail:

> I understand that rumor has it that we
> have now been officially profitable in
> the PDVSA department. Since I was
> actively working on this account for
> over one year, why have I not received
> any credit? (SI Ex O-18 #JJ000175).

Jourdan understood the terms of the Sales Program. Yet her inquiries of Bujold were not in the context of the Sales Program. The Sales Program measured gross profit on Jourdan's customers for the calendar year. (SI Ex D). Thus, her inquiry regarding credit for work that exceeded one year was not

directed to the Sales Program.

Jourdan also knew, as Bujold confirmed, that the Sales Program did not take into account losses related to a customer in a year prior to that being considered under the plan. Thus, under the Sales Program, the 1998 losses in the Bariven Account would be disregarded when considering whether or not the account was profitable for 1999. Indeed, the Complaint is based on just that premise. The Complaint states that the profits for which Jourdan claimed she was entitled to receive credit under the Sales Incentive Program were the gross profits in 1999, without deducting the 1998 losses. (SI Ex A: Compl ¶ 8).

However, when Jourdan questioned Bujold on the profitability of the account in the September 99 E-Mail, her inquiry was directed to the account's profitability over the life of the account, from April 1998 through the date of her inquiry. Thus, her inquiry was not directed to the Sales Program.

And Bujold understood the entire period of the account's existence to be the thrust of that part of Jourdan's inquiry. Bujold responded that:

> It has become profitable but only to a small degree — the initial period losses were excessive and could take up to five years to recoup - … this account has progressed from an endless flow of red ink to being reasonably profitable -…. (SI Ex O-18 JJ000175).

The September 99 E-Mail did not expressly mention a
commission under the Sales Program, did not mention the Sales
Program, and did not refer to Jourdan as owning the account.
Jourdan used the royal "we" when she made her statement about
the profitability of the account. Since Jourdan was taken off
the account on August 21, 1998, in describing her work "over one
year", she was referring to devoting, in 1997 and 1998, over one
year of her time until approximately September 1998 to
developing the Bariven Account for Schenker. (SI Ex A Compl ¶
6).

Moreover, Bujold stated in reply to the September 99 E-Mail
"with mr engst involvement it became a corporate account and
there is no sales credit." (SI Ex O-18, #JJ000175). Engst was
involved from January 1998 when he reported to Schenker Germany
on the results of the meeting with the Bariven evaluation team.
(See Statement of Facts D-1). Thus Bariven was a Global Account
before the bid was awarded to Schenker.

Prior to sending Bujold the September 99 E-Mail, Jourdan
periodically questioned Bujold about the profitability of the
account. When she did so, she was also inquiring about the
account's aggregate profit over its lifetime, from April 1998 to
the date of her inquiry in 1999. She did not ask Bujold to tell
her if the account was profitable for the period from January 1,
1999 through the date of her inquiry, the standard under the

— 41 —

Sales Program, without deduction of the 1998 losses. (JJ2 Tr 284:9-285:10; 300:11-24).

Had Jourdan thought or claimed that she was entitled to credit towards a Sales Program commission for sales to Bariven in 1999, knowing the account lost money in 1998, she would have asked Bujold to tell her the gross profits on the account limited to 1999 sales. And she would have insisted that Bariven be credited to her as the "gusher" that Bujold said she needed to reach her 1999 sales goal. She did neither. After Bujold told Jourdan she would receive no sales credit related to Bariven, prior to commencing this action, Jourdan made no claim in writing and failed to communicate to anyone that she alone was entitled to a commission on the full sales of the Bariven division.

**ARGUMENT**

**POINT I**

**SUMMARY JUDGMENT SHOULD BE GRANTED
DISMISSING JOURDAN'S CLAIM FOR INCENTIVES ON
THE BARIVEN CONTRACT**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.; <u>Vogel v. Veneman</u>, 276 F.3d 729, 732 (5th Cir. 2002).

In making a summary judgment determination, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." <u>Evans v. City of Bishop</u>, 238 F.3d 586, 589 (5th Cir.2000); <u>accord</u>, <u>Vogel v. Veneman</u>, 276 F.3d at 732; <u>Fierros v. Texas Department Of Health</u>, 274 F.3d 187, 190 (5th Cir 2001).

There is no material question concerning any of the following facts, each of which is documented in the statement of facts above:

1. Schenker made the bid for the global business of Bariven on behalf of Schenker worldwide.

2. Bariven was a Global Account from the time the team was assembled to make a bid for the global business of Bariven.

3. No salesperson received Sales Program Credit for work on a Global Account.

4.    No salesperson ever received any Sales Program Credit for work on Bariven.

5.    Jourdan understood that no salesperson received Sales Program Credit for work on a Global Account.

6.    The accounting department account opening records for Bariven ("**Account Opening Documents**") were drafted by Jourdan.

7.    No Account Opening Documents for Bariven ever indicated that Jourdan was the salesperson for the account.

8.    The Bariven Branch was established to process the business for the Bariven Account.

9.    The Bariven Branch did not have any salesperson assigned to it.

10.   Jourdan was never assigned to the Bariven Branch as a salesperson.

11.   Jourdan knew that she was never identified as the salesperson for the Bariven Account when she asked Bujold in the September 99 E-Mail if she could get such credit simply by contacting the Norfolk accounting department.

12.   The September 99 E-Mail, the correspondence to and from Jourdan when she was trying to get additional Sales Program Credit for 1998, and her 99 correspondence regarding Sales Program Credit for sales to Halliburton and other customers who were removed as her customers establish that Jourdan understood how to get herself credited as the salesperson for a customer.

13.   Jourdan knew that credit as a salesperson for a customer was established when the account was opened.

14.   Jourdan knew that credit could be established for a customer, if not when the account was opened, then later when the salesperson learned that credit was not properly assigned to them.

15.   Jourdan periodically received lists of her customers' sales in 1998 and 1999, none of which ever included Bariven.

16.   Bujold repeatedly prodded Jourdan in 1999 to advise him in writing how she intended to reach her sales goal for 1999.

17.    Jourdan repeatedly advised Bujold and Lana Warren in writing of the identity of her existing and target customers.

18.    Jourdan never put anything in writing to indicate that Bariven was her customer.

19.    Jourdan never put anything in writing to indicate that she was to receive Sales Program Credit for Bariven.

20.    While employed, Jourdan never told any employee of Schenker that she was to receive Sales Program Credit for Bariven.

21.    Schenker never put anything in writing to indicate that Bariven was Jourdan's customer.

22.    Schenker never put anything in writing to indicate that Jourdan was to receive Sales Program Credit for Bariven.

23.    Bujold advised Jourdan in the September 99 E-Mail that Bariven was a Global Account from the time when Engst became involved with the account.

24.    Engst became involved with Bariven as Global Focal Point before the bid was made to Bariven.

25.    Jourdan informed Engst that the Schenker bidding team had designated Engst as the Global Focal Point.

## POINT II

### JOURDAN WAS NOT ENTITLED TO INCENTIVES ON THE BARIVEN CONTRACT

**A.    MANAGEMENT USED ITS DISCRETION IN MAKING BARIVEN A GLOBAL ACCOUNT**

The Sales Program adopted in 1998 was a change in the

Schenker incentive program. (SI Ex D, p 2 [first par]. Moreover,

the Sales Program makes it clear that management in its

discretion could assign accounts to, and take accounts away

from, a salesperson ("a sales person maintains an account for as

long as management deems necessary."). (SI Ex D, p 2). Indeed,

the adoption of the Sales Program in May 1998, retroactive to

— 45 —

January 1, 1998, was clearly an exercise of such management discretion.

Jourdan was informed and understood that management had the discretion to assign accounts to a salesperson and to take accounts away from a salesperson. (JJ Tr 248:25—253:17).

Even if Schenker had not designated Bariven as a Global Account previously, when Jourdan was informed on August 21, 1998 that she was no longer to be involved with the Bariven account and was to return to and pursue her sales efforts, she was removed as the Bariven salesperson for purposes of obtaining Sales Program Credit. (SI Ex I-11 at #JJ000148). Her removal was the prerogative of management.

Jourdan never made any claim in her Petition that management had no right to reassign customer accounts to or away from her.[13]  Jourdan never claimed that she found ambiguous the meaning of "necessary" used in the Sales Program.  Under Texas law, where management has discretion to act, an employee has no cause of action "absent proof that the employer's discretion was exercised in bad faith." Lone Star Steel Co. v. Scott, 759 S.W.2d 144 at 152 (Ct. App. Tx., Texarkana 1988). Jourdan never made any claim that management acted in bad faith, even after it removed her from the Bariven account.

This Court previously concluded that the word "necessary" was ambiguous in a phrase of the Sales Plan that "a sales person maintains an account for as long as management deems <u>necessary</u>." (SI Ex X at 13 n 10).

By such language, the Sales Program did not grant management absolute discretion to reassign accounts, but the power to do so only where management found it was necessary.

The Court did not focus its analysis on the entire phrase: "management deems necessary," with emphasis on what management, not the salesperson, deemed necessary. There is no ambiguity in that reading.  To be ambiguous under Texas law, the language has to be "'reasonably susceptible to more than one meaning.'" (SI Ex X p 13, n. 10 (citations omitted)). Under the facts of this case, management's reservation of discretion to assign Schenker customers to different salespersons or to a Global Account status when management deemed it necessary to do so was not "reasonably susceptible to more than one meaning." Indeed, the Court did not identify any alternative meaning for the phrase other than as granting discretion to management to reassign accounts. Indeed, here, although the Court did not previously have such facts before it, Jourdan's constant interference with the operations of the Bariven Branch was the basis for

---

[13]   Jourdan was fully aware of management's use of its discretion to declare accounts as "house accounts" and to remove employees from accounts as an "operational decision." (JJ Tr 248:25—253:17).

management deciding to bar her from further work on the account.

The Court noted that the Sales Program "provides no objective criteria nor describes any kinds of circumstances to define what would constitute necessity for such a transfer of an account." (SI Ex X, p 13, n 10). However, management stated its reason for exercising its discretion. The Sales Program states in the sentence following its reservation of authority to reassign accounts that it retains such authority to facilitate the number of accounts "allotted to [salespersons]". (SI Ex D). Assigning accounts is a basic, unambiguous, function of management.

Schenker had the discretion to remove Jourdan from the Bariven account and it did so in August 1998, before the account made any profit. On that basis, summary judgment should be granted to Schenker, even if the Sales Program were a valid contract, because Jourdan had no right to claim commissions, under the language of the Sales Program, after she was removed from the account.

Even if the Sales Program or management policy were different in respects other than as relate to management's discretion to reassign accounts, the result does not change. At the time Jourdan was removed from the account, Schenker was losing millions of dollars on sales to Bariven. There was no credit for gross profit that could have been withheld from

- 48 -

Jourdan.

1998 sales to Bariven created a substantial loss to Schenker. Assuming that a salesperson was entitled to receive commissions under the Sales Program through the date on which they were removed from an account or the account was made a corporate, house or global account, Jourdan was not entitled to any increase in her 98 sales incentive based on sales to Bariven since Schenker had no gross profits on the Bariven Account prior to Jourdan being removed from it.

Assuming without conceding that the Bariven account was once assigned to Jourdan, after she was told that she was no longer working on it, Jourdan was no longer entitled to receive a sales incentive with respect to Bariven. As a sales manager, Jourdan assigned customers to and took customers away from the salespersons she managed, with the same consequences. (JJ Tr 252:12—253:17). If the customer were assigned to another salesperson, as Jourdan said happened, the successor would earn the credit for sales growth. (SI Ex P-1 at #JJ000340-341). Indeed, Jourdan's e-mails regarding her 1998 commissions reflected that after an account was taken from one person and reassigned to another salesperson, the new salesperson was entitled to credit for the gross profit on the sales made after the switch, and the prior salesperson, if still employed, to such credit on sales before the switch. (e.g. SI Ex P-1 at

- 49 -

#JJ000340-341).

**B.    JOURDAN WAS NOT ENTITLED TO ANY INCENTIVE ON BARIVEN FOR 99**

Jourdan was terminated before she was eligible to receive a commission based on the gross profits of Bariven in 1999. Assuming Schenker did not remove Jourdan from the Bariven Account, that Jourdan was the salesperson for the account, and that Bariven had not been designated a non-commissionable Global Account, when Jourdan was terminated before management determined the amount of Sales Program Credit on the Bariven Account, she lost her right to claim any Sales Program incentive for 1999.

Even if a material question of fact did exist regarding Jourdan's claim of being the salesperson who was to receive credit for all sales to Bariven, it is undisputed that it was Schenker's policy to pay a commission under the Sales Program for year one only if the employee were still employed in the following year, at the time commissions were paid to all employees who qualified under the Sales Program. With respect to 1998 and 1999, Schenker paid incentives in the year following that in which they were earned. (SI Ex R: Gifford Aff ¶ 9). Consistent with the policy, incentives for 98 were calculated and paid to Jourdan before the end of the second quarter of 99.

Id.[14]

Jourdan testified that she was fired because Schenker wanted to avoid paying her under the Sales Program (JJ Tr 467:23-468:11), as the Court noted, indirectly acknowledging the policy. (SI Ex X at 14 n 12). Bujold also confirmed the existence of the policy (MB Tr 13:18-14:17). Indeed, no salesperson was ever assigned to receive credit for sales on the Bariven Account. (SI Ex R: Gifford Aff ¶ 13). (Of course, the facts show that Schenker did everything it could in 1999 to get her credit for higher sales in 1998, qualifying her for a 1998 commission, and worked to get her an acceptable position and to assist her in her sales efforts in 1999, each contrary to her claim that she was fired to avoid paying her a commission.)

Finally, Jourdan's claim to commissions for 1999 must be dismissed. She was terminated months before profits would have been determined and commissions to Jourdan calculated, making her ineligible for incentives uinder the Sales Plan for 1999. (See SI Ex R: Gifford Aff ¶ 11).

---

[14]    The Sales Program states that payments of incentives were to be made quarterly. (SI Ex D at 2).  This schedule was not followed. (JJ Tr 271:1-9).

**CONCLUSION**

    Schenker's motion for summary judgment should be granted.

Dated:  New York, New York
       January 14, 2005

                         Respectfully submitted,

                         CAREY & ASSOCIATES

                         By: /s/ MICHAEL Q. CAREY
                            Michael Q. Carey (MC1802)
                         Admitted Pro Hac Vice
                         521 Fifth Avenue, Suite 3300
                         New York, NY  10175-3399
                         (212) 758-0076
                         (212) 758-0069

                         ATTORNEY-IN-CHARGE FOR DEFENDANT
                         SCHENKER INTERNATIONAL, INC.

LOOPER, REED & McGRAW, P.C.

By: _____
     James McGraw
Fed ID No. 4776
1300 Post Oak Blvd., Suite 2000
Houston, TX  77056
Tel: (713) 986-7000
Fax: 713-986-7100

LOCAL COUNSEL FOR DEFENDANT SCHENKER
INTERNATIONAL, INC.